[No. S004636. Crim. No. 23833. Feb. 24, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHAN LOUIS MITCHAM, Defendant and Appellant.

1032

COUNSEL

Paul L. Hoffman, under appointment by the Supreme Court, Joan V. Howarth, John Heilman, Mark Silverstein, Stephanie Ross, Loeb & Loeb, Douglas E. Mirell, Peter N. Scolney, Hermia Shegog Whitlock, Megan Scott-Kakures, Anthony E. Goldsmith, Shari M. Wollman, Michael J. Axelrad and Michael D. Stein for Defendant and Appellant.

John Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Laurence K. Sullivan, Blair W. Hoffman and Rene A. Chacon, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, J.**—Following the guilt phase of a jury trial, defendant Stephan Louis Mitcham was found guilty of one count of first degree murder (Pen. Code, §§ 187, 189),[1] one count of attempted murder (§§ 187, 664), one count of robbery (§ 211), and one count of assault with a deadly weapon (§ 245, subd. (a)(2)). The jury also found that defendant used a firearm in the commission of each offense (§ 12022.5) and inflicted great bodily injury in the commission of the attempted murder and robbery (§ 12022.7), and found true a special circumstance allegation that he committed the murder during the course of a robbery (§ 190.2, subd. (a)(17)(i)). After the penalty phase of the trial, the jury imposed the death penalty.[2] We affirm the judgment in its entirety.

### FACTS

The evidence at trial established that on April 5, 1983, defendant committed a robbery at Ormond's Jewelry Store, and that during the robbery he murdered the proprietor, James Ormond, and attempted to murder Yvette Williams, a store employee. The evidence also established that codefendant Keith Hammond drove the getaway car after the robbery and murder.

## I. GUILT PHASE EVIDENCE

### A. *The prosecution's case.*

#### 1. *The crimes.*

About 1 p.m. on April 5, 1983, defendant entered Ormond's Jewelry Store on Lakeshore Avenue in Oakland. He was wearing a hooded, maroon-colored jacket and sunglasses, and carried a grocery sack containing a pillow or blanket. James Ormond, the 79-year-old proprietor, and Yvette Williams, a store employee, were seated in the store. In response to defendant's request to see a better selection of engagement rings, Ormond walked to the back of the store to a safe. He opened some drawers which contained wedding sets. Williams became fearful of defendant and began to stand up in order to leave. As she did so, defendant looked over, and she sat back down. Defendant approached her, asked, "How are you doing today, Miss?," and then shot her in the left cheek.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

[2]Codefendant Hammond was tried with defendant and was convicted of one count of first degree murder, one count of attempted murder, and one count of robbery. He was sentenced to a prison term of 32 years to life.

Williams fell to the floor and remained motionless. Ormond yelled, "No. How could you do that to that girl?" Williams then heard scuffling noises followed by two gunshots. She lapsed into unconsciousness. When she regained consciousness, she heard sounds of someone rummaging through the drawers of the safe. She then saw defendant walk past her toward the store entrance, jump over a display case, and leave.

Nancy Gee was looking at the jewelry store window display when she heard shouting and saw Ormond with his hands on defendant's neck. She then heard some "pops." She alerted Pasquale Cinquegrano, who worked next door, and then walked up the street. A short time later, defendant walked past her and crossed Lakeshore Avenue.

Pasquale Cinquegrano, alerted by Gee, went next door and saw defendant rummaging through the safe drawers. After two or three minutes, defendant left the store. As he passed Cinquegrano, he said, "If you touch me, I'll kill you."

Three other pedestrians, alerted to the struggle, clustered by the door of the jewelry store. They saw defendant leave the store and pass by them holding a grocery sack. Defendant threatened one of them that, if he followed, defendant would shoot him. The pedestrians saw defendant cross Lakeshore Avenue, head toward Trestle Glen Avenue, and disappear from view near a Baskin-Robbins store.

Approximately the same time the robbery was in progress, codefendant Hammond entered the Baskin-Robbins store on Trestle Glen. He paced back and forth and then asked the proprietor for a rubber band. A minute or so after he left the store, a Ford Falcon was observed making a turn from the Baskin-Robbins store onto Trestle Glen. Three witnesses saw a Black man wearing a maroon jacket and carrying a paper bag walk swiftly up from Lakeshore Avenue and jump into the backseat of the Ford Falcon. One witness heard the driver of the vehicle say, "Get down, get down." The automobile then sped up Trestle Glen. Two witnesses subsequently identified codefendant Hammond as the driver. Hammond owned a gold and white Ford Falcon, identified by two witnesses as the vehicle driven by Hammond from the scene of the crime.

The police arrived within minutes. Williams was taken to the hospital, where she had surgery to remove two bullet fragments from the left side of her face. Her jaw had to be reconnected, and subsequently she was hospitalized for psychiatric trauma.

Ormond died of multiple gunshot wounds in the right forehead, the left chest, and the right side of the abdomen. The forehead wound indicated it

was inflicted at close range. Both Williams and Ormond had been shot with .22-caliber bullets. A criminalist testified that test-firing a .22-caliber gun with a pillow placed over the gun muffled the firing sound of the weapon.

At trial, Williams, Gee, and Cinquegrano made positive in-court identifications of defendant as the gunman. On cross-examination, however, each acknowledged discrepancies in his or her earlier description of the gunman to the police or to other witnesses at various times following the commission of the crime, as well as discrepancies between the earlier descriptions and the in-court identifications. The three pedestrians who had clustered by the jewelry store door and had seen the gunman leave were unable to make in-court identifications of defendant but gave descriptions of his height, age, and race generally consistent with defendant's characteristics. They identified the jacket defendant was wearing at the time of his arrest as similar to the one worn by the gunman.

### 2. *Testimony of Richard Leonard.*

Richard Leonard testified he was an acquaintance of defendant and Hammond. On the afternoon of the crime, Leonard was outside the apartment of a mutual friend. Defendant and Hammond arrived in a vehicle driven by a third person whom Leonard did not know. Defendant was wearing a maroon jacket. He offered to sell Leonard a wedding set from a collection of approximately 20 tagged sets of wedding and engagement rings. Leonard purchased from defendant for $250 a set bearing a price tag of approximately $950.

Defendant told Leonard he had obtained the rings from a jewelry store located near the lake, and had shot a woman and a man before ransacking the store. He said Hammond had been waiting around the corner from the store. Defendant had a .22-caliber revolver in his pocket and said he had used it in committing the crime.

The following day, Leonard read about the murder and robbery in the newspaper. A day later, he read that a reward was being offered for information concerning the crime. On April 8, he went to the Oakland Police Department and repeated what defendant had told him. Leonard's statement to the police was tape-recorded. When a police officer agreed to reimburse him for the rings, Leonard brought them to the police station. At that time he made a photographic identification of defendant and discussed the reward.

Leonard aided the police in capturing defendant on April 10. When Leonard subsequently testified at the preliminary hearing, no criminal

charges were pending against him in Alameda County. He ultimately obtained immunity from any charges relating to the crimes in the present case, but not from other charges of robbery and theft which subsequently were brought against him in Alameda County. At the time of trial, Leonard had received $500 as part of the reward and expected to receive additional money.

### 3. *Defendant's arrest.*

At the time of his arrest on April 10, defendant was wearing a maroon jacket and had no identification in his possession. He told one police officer his name was "Louis Banks" and told another his name was "John Louis."

### B. *The defense case.*

Neither defendant nor codefendant Hammond testified, and the defense presented no evidence. In closing argument, defendant's counsel argued the prosecution had failed to prove beyond a reasonable doubt defendant's identity as the perpetrator of the crimes, and alternatively had failed to prove beyond a reasonable doubt that defendant had possessed the intent to kill Ormond.[3]

The jury found defendant guilty of all charged crimes and found true both alleged enhancements and the robbery-murder special circumstance.

## II. PENALTY PHASE EVIDENCE

### A. *The prosecution's case.*

Williams testified that after she was shot, she was hospitalized for approximately two weeks. Subsequently, she was hospitalized for several months for treatment of psychiatric problems resulting from the shooting. She suffered two nervous breakdowns during this period and at times was suicidal. At the time of trial, she remained unable to work and was under a physician's care.

The transcript of the testimony of Lorna Robinson, given at the preliminary hearing in an unrelated robbery case against defendant, was read to the jury. Ms. Robinson testified that on March 27, 1983, while she was working as a checker at a Lucky store in Oakland, a man pointed a handgun at her

---

[3]Hammond's counsel argued that although the evidence established his client had driven the getaway car, the prosecution had failed to prove he had advance notice of or intended to aid and abet the commission of the crimes.

and told her to give him her $20 bills. He took the approximately $500 she gave him and left. She furnished a description of the robber to the police.

Ms. Robinson later saw a photograph of defendant in the newspaper accompanying an article concerning the crime committed in the present case. She told the police the man in the photograph looked like the man who had robbed her. She then viewed a physical lineup conducted at the police station and identified defendant as the robber, but marked her identification of him with a question mark. At the preliminary hearing in the Lucky store robbery prosecution, she again identified defendant as the robber.

Another Lucky store employee testified that at the time of the robbery, he pursued the robber running from that store. The employee selected defendant's photograph from a lineup as the one appearing most like the robber but was not positive of his identification.

### B. *The defense case.*

The defense presented several witnesses in mitigation. Witnesses acquainted with defendant during his elementary and junior high school years testified that he was honest, kind, "a good kid," a good student, and highly regarded by his fellow students. He was the class speaker at his junior high school graduation. One witness testified that she had seen defendant one month prior to the commission of the charged offense. He did not seem himself and spoke as if he was under the influence of "angel dust." Defendant's mother testified that she and her mother had raised defendant, and that she did not believe he had used drugs during the time he was residing with her. She herself had a drug problem.

Dr. Steven Lerner, a forensic toxicologist, testified concerning the symptoms and effects of the use of PCP or "angel dust." He had not examined defendant and had no information indicating that defendant was a user of PCP. Dr. Lerner, having reviewed police records of defendant's arrest in December 1982 for being under the influence of drugs, concluded that defendant's conduct in part was consistent with the use of PCP. On cross-examination, Dr. Lerner testified that defendant's behavior during the Lucky store robbery and the Vogue Fashion robbery (evidence of which was presented on rebuttal, discussed *post*) did not indicate the use of PCP.

An Oakland police officer testified that in December 1982 she arrested defendant for being under the influence of drugs.

### C. *Rebuttal.*

The prosecution presented evidence which rebutted the defense's portrayal of defendant's juvenile life as exemplary. A high school teacher testified that

once during an examination, defendant began shouting at him. The teacher left and then returned to find that the contents of his desk had been dumped on the floor. A bus driver who drove a bus to and from defendant's junior high school testified that in 1973 defendant assaulted him, and in 1974 defendant was in the company of a group of students who assaulted him. By stipulation of counsel, defendant's juvenile court file was admitted into evidence. A probation officer testified that, in a juvenile court proceeding, allegations that defendant had assaulted a bus driver and in another incident had assaulted a construction worker, were found true, and defendant was made a ward of the juvenile court.

Mary Ann Clar testified she had been robbed by defendant. She owned Vogue Fashion, a ladies' clothing store. On December 21, 1982, defendant entered the store, approached her, and said, "This is a robbery. I want the money." He pointed an object at her that was wrapped in a piece of cloth and said, "Do not push any buttons . . . or I will blow you away." Ms. Clar gave defendant approximately $600. Later, in 1983, Ms. Clar saw defendant's photograph in the newspaper in connection with the crime charged in the present case. She selected his photograph from a lineup and made an in-court identification.

DISCUSSION

I. GUILT PHASE ISSUES

 A. *Admission of Hammond's statement.*

Following his arrest, Hammond gave a statement to the police inculpating both defendant and himself in connection with the crimes. After Hammond made the statement, the police, pursuant to *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (discussed *post*), requested that Hammond provide another statement referring solely to his own involvement in the crimes and omitting any reference to defendant. Hammond complied, giving a redacted statement omitting any reference to defendant.

At trial, over Hammond's objection, Hammond's redacted statement was admitted into evidence against him. Defendant's counsel objected to the admission of the statement on hearsay grounds, and requested that the statement be deemed hearsay as to defendant and that the jury be admonished to disregard the statement as to defendant. The trial court sustained the objection, instructing the jury that the statement was not to be considered against defendant, but only against Hammond. The redacted statement then was read into evidence, commencing, as follows, with a police officer's

question: "Q. About what you did, without mentioning anyone else's name, without anyone else's involvement, I would like to talk to you about what you have done since Tuesday. Do you understand?" Hammond answered in the affirmative. He then stated that on the day of the crimes, he left Alameda College and drove to a car wash. He then drove to Oakland on the Mac-Arthur Freeway, eventually got off the freeway, and went up Lakeshore Avenue to the Baskin-Robbins store. He entered the store and then returned to his vehicle, making a turn to the right in order to proceed up another street. When a truck impeded his way, he stopped, later resuming his way and proceeding onto the MacArthur Freeway. The following morning, he read about the Lakeshore Avenue murder. At some point he came into possession of three rings he thought might be related to the murder and robbery. They were gold and silver wedding ring sets with tags on them. He threw them away a couple of hours after obtaining them.

During closing argument, without objection, the prosecutor discussed Hammond's statement while arguing the case against Hammond and responding to arguments made by Hammond's counsel. In instructing the jury, the trial court repeated the limited use to be made of the statement.[4]

Defendant contends the admission of and comments on Hammond's redacted statement violated defendant's Sixth Amendment right of confrontation as defined in *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] (*Bruton*) and *People* v. *Aranda, supra,* 63 Cal.2d 518. At trial, however, defendant's counsel did not seek total exclusion of the statement but requested only that it be admitted solely against Hammond and that the jury be so admonished. The trial court granted this request. Absent a timely and specific objection on the ground defendant now asserts on appeal, his contention is deemed waived. (*People* v. *Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [276 Cal.Rptr. 827, 802 P.2d 330]; *People* v. *Green* (1980) 27 Cal.3d 1, 22 [164 Cal.Rptr. 1, 609 P.2d 468].)

Moreover, the contention has no merit.[5] Defendant bases his claim on *Bruton, supra,* 391 U.S. 123. ■ The essential holding of *Bruton* was

---

[4]"Now, evidence has been admitted against one defendant and not as to the other. And at the time the evidence was admitted, I told you and admonished you it could not be considered by you as against both defendants, but only upon the one upon whom it was entered. [¶] And in this particular case, I'm talking about the statement of Mr. Hammond. That statement was admitted and read and is admissible only as against the defendant Hammond and not as against the defendant Mitcham."

[5]Throughout this opinion, we shall discuss the merits of particular claims that are procedurally barred, when we conclude that such discussion may eliminate any uncertainties that could lead to time-consuming but ultimately unavailing ineffective-assistance-of-counsel claims.

summarized and restated in a more recent decision of the high court: "[A] defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." (*Richardson* v. *Marsh* (1987) 481 U.S. 200, 207 [95 L.Ed.2d 176, 186, 107 S.Ct. 1702].)

In *People* v. *Aranda, supra,* 63 Cal.2d 518, 528-530, we anticipated the rule of *Bruton* and held that when the prosecution seeks to introduce a codefendant's extrajudicial statement that incriminates not only the codefendant but also the nondeclarant defendant, the trial court must adopt one of the following procedures: "(1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible. Similar rules concerning joint trial have been adopted in other jurisdictions and have been found workable. [Citations.]" (*Id.*, at pp. 530-531, fn. omitted.)

Although *Aranda* was not declared as a constitutionally based doctrine, the rule that it states has been recognized as constitutionally based (at least in part), ever since the decision in *Bruton*. (See *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1121 [240 Cal.Rptr. 585, 742 P.2d 1306].)[6]

The process of redaction suggested in *Aranda*, whereby a confession is edited so that all statements that identify or implicate the nondeclarant

---

[6]To the extent *Aranda* corresponds to the *Bruton* rule, it was not abrogated by the 1982 adoption of Proposition 8 (specifically section 28, subdivision (d) of article I of the California Constitution, the "Truth-in-Evidence" provision). (See *In re Lance W.* (1985) 37 Cal.3d 873, 890 [210 Cal.Rptr. 631, 694 P.2d 744].) The *Aranda* rule, however, may depart from that of *Bruton* in one respect. *Bruton* applies only when the declarant codefendant does not testify and thus is unavailable for cross-examination. (*Nelson* v. *O'Neil* (1971) 402 U.S. 622 [29 L.Ed.2d 222, 91 S.Ct. 1723].) Although we have never determined the issue, at least one appellate court has concluded that *Aranda* applies whenever the prosecution proposes to introduce into evidence at a joint trial the extrajudicial confession of the codefendant, even if the codefendant testifies. (See *People* v. *Brown* (1978) 79 Cal.App.3d 649, 656 [145 Cal.Rptr. 130].)

Because in the present case codefendant Hammond did not testify, the *Bruton* rule applies; we therefore need not and do not determine the extent to which the *Aranda* rule, if broader than the *Bruton* rule, has been abrogated.

defendant are deleted and replaced with neutral language, has been followed by California courts. (See *People* v. *Jacobs* (1987) 195 Cal.App.3d 1636, 1648-1649 [241 Cal.Rptr. 550].) Thus, if references, either direct or indirect, to the nondeclarant defendant are deleted, the extrajudicial statement may be admitted against the declarant. (*People* v. *Manson* (1976) 61 Cal.App.3d 102, 150-151 [132 Cal.Rptr. 265].) Redaction is ineffective where, for example, the confession includes a reference to "the other guy" which, in the context of other evidence, implicates the nondeclarant defendant. (*People* v. *Jacobs, supra,* 195 Cal.App.3d at p. 1652.)

In *Richardson* v. *Marsh, supra,* 481 U.S. 200, the high court reaffirmed the *Bruton* rule, while also confirming that the admission of a codefendant's redacted statement, omitting any reference to the nondeclarant defendant, does not violate *Bruton.* In that case, involving a joint trial of a defendant and a codefendant charged with murder, robbery, and assault, the codefendant's confession was admitted over the defendant's objection. The confession had been redacted to omit all indications that anyone other than the codefendant and a third accomplice had participated in the crimes. In his confession, the codefendant described a conversation he had with the third accomplice as they drove to the victim's home, during which the accomplice said that he would have to kill the victims after robbing them. At the time the confession was admitted, the jury was admonished not to consider it in any way against the defendant. The codefendant did not testify. The defendant's testimony indicated that she (defendant) had been inside the vehicle with the codefendant and the third accomplice but had not heard their conversation, and that she had not intended to rob or kill anyone.

Affirming the defendant's conviction of felony murder and robbery, the court found no *Bruton* error. The court held the confrontation clause was not violated by the admission of the nontestifying codefendant's confession with a proper limiting instruction, where the confession was redacted to eliminate any explicit reference to anyone other than the codefendant and the third accomplice. The court stated the confession "was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." (*Richardson* v. *Marsh, supra,* 481 U.S. at p. 208 [96 L.Ed.2d at p. 186], fn. omitted.) The court determined that where the confession is not facially incriminating, the jury is more likely to obey the instruction to disregard the confession as to the nondeclarant defendant. (*Ibid.*) The court concluded that if limited to facially incriminating confessions, the *Bruton* rule could be complied with by redaction, thereby enabling the parties to predict with some certainty the admissibility of a confession; but if the *Bruton* rule were extended to confessions which are incriminating only by reason of their "contextual implication," it would be impossible to

predict in advance of trial the admissibility of a confession. (*Id.*, at pp. 208-209 [95 L.Ed.2d at pp. 186-187].)

Here, Hammond's redacted statement made no reference, either direct or indirect, to defendant or to defendant's identity or existence. Defendant objects that the initial admonition by the police to Hammond, that he give his statement without mentioning anyone else's name or involvement, improperly "alluded to an unidentified accomplice." We disagree. The admonition simply directed Hammond not to refer to anyone other than himself in describing his activity. It did not refer to the existence or identity of any accomplice of Hammond in the commission of the crimes, but alluded only to the obvious—that somebody committed the crimes. Unlike the case of *People* v. *Jacobs, supra*, 195 Cal.App.3d 1636, where the codefendant's redacted statements substituted the phrase "the other guy" for the defendant's name, thus referring to an accomplice and implicating the defendant, Hammond's statement made no reference to any other person in his company.

Defendant also argues the statement placed Hammond at the scene of the crimes and thereby "ineluctably" placed defendant at the scene. It is true that when Hammond's statement is linked to Leonard's testimony, the statement implicates defendant. The statement facially, however, neither directly nor indirectly refers to or implicates defendant. It was therefore admissible with the giving of a limiting instruction. (*Richardson* v. *Marsh, supra*, 481 U.S. 200.)

Defendant also claims the prosecutor effectively nullified the limiting instruction by certain remarks he made during closing argument. Defendant refers to the prosecutor's remark that the argument of Hammond's counsel,[7] that defendant had no prearranged getaway plan and had met Hammond only coincidentally subsequent to the crimes, was incredible.

By this remark, the prosecutor simply asked the jury to draw certain inferences, from all the evidence presented in the case, and to find that other inferences argued by the defense based upon Hammond's statement were unreasonable. The prosecution has broad discretion to state its views as to what reasonable inferences may and may not be drawn from the evidence. (See *People* v. *Kelly* (1990) 51 Cal.3d 931, 967 [275 Cal.Rptr. 160,

---

[7]Hammond's counsel opened his closing argument with the statement that "[t]he issue on behalf of my client Keith Hammond is whether he knew before the robbery that there was going to be a robbery and did he aid and abet, counsel or advise the commission of this crime? . . . [¶] . . . I think we know from the evidence that Keith Hammond did in fact help the robber get away from the scene of the crime. We know he helped him. [¶] The question is whether he knowingly and intentionally helped him before the robbery had occurred."

800 P.2d 516].) The prosecutor did not indicate or imply that Hammond had stated that defendant had accompanied him or in any way had implicated defendant. Furthermore, the trial court restated the limiting instruction in its final instructions to the jury. The limiting instruction clearly was not nullified by the prosecutor's closing argument.

### B. *Denial of severance.*

During jury selection, codefendant Hammond moved to sever his trial from that of defendant on the ground that, because he was not facing the death penalty as was defendant, he had a right not to be tried before a jury from which persons opposed to the death penalty had been excluded. Defendant also moved to sever his trial from that of Hammond on the ground that under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (overruled by *People* v. *Anderson, supra,* 43 Cal.3d 1104), the special circumstance allegation against Hammond would have to be dismissed (which it later was), and the dismissal would be prejudicial to him because the jury would hear that the trial court "has stamped its imprimatur on Mr. Hammond's conduct . . . ." The motions were taken under submission and denied.

Defendant contends the trial court erred in denying the motions for severance. ■ He first contends the denial of Hammond's motion constituted error and was prejudicial to him. Defendant, however, did not join in Hammond's motion at the time it was made, and his current objection therefore is deemed waived. (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 77-78 [241 Cal.Rptr. 594, 744 P.2d 1127].) Moreover, defendant lacks standing to complain of the denial of Hammond's motion, because the grounds asserted by Hammond in support of his motion to sever were relevant only to Hammond and not to defendant.

■ As to the denial of his own motion to sever, defendant argues there were exceptional circumstances requiring severance: the only uncontested evidence linking defendant to the crime was Hammond's confession and Leonard's testimony, and but for Hammond's statement, which would not have been admissible against defendant had his trial been severed, the case against him was weak; in addition, he contends, his defense conflicted with that of Hammond.

Whether denial of a motion to sever constitutes an abuse of discretion must be decided on the basis of the facts known and the showing made at the time of the motion. (*People* v. *Miranda, supra,* 44 Cal.3d at p. 78; *People* v. *Balderas* (1985) 41 Cal.3d 144, 171 [222 Cal.Rptr. 184, 711 P.2d 480].) As

noted above, in his motion defendant relied solely on the alleged prejudice that he claimed would result from the anticipated dismissal of the special circumstance allegation against Hammond. Defendant did not raise the arguments he now makes, nor does he presently claim that the trial court abused its discretion in rejecting his prior arguments. For this reason alone, we are required to reject defendant's challenge to the trial court's ruling. (See *People* v. *Miranda, supra,* 44 Cal.3d at p. 78.)

Furthermore, defendant's current arguments lack merit. The governing statutes state a general preference for joint trial of jointly charged defendants. (§ 1098; see *People* v. *Keenan* (1988) 46 Cal.3d 478, 499 [250 Cal.Rptr. 550, 758 P.2d 1081]; 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2518, p. 3021.) Here, there were no exceptional circumstances warranting severance. Hammond's statement was effectively redacted to omit any direct or indirect reference implicating defendant; the admission of the statement therefore did not require severance. (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1230 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Aranda, supra,* 63 Cal.2d, at pp. 530-531.) Additionally, the defenses of the two defendants were not inconsistent. Defendant's defense was that the prosecution had failed to prove beyond a reasonable doubt that he was the perpetrator of the crimes and, alternatively, that he did not have the intent to kill Ormond. Hammond's defense was that he had not knowingly aided and abetted the commission of the crimes.

Defendant also contends he was unfairly prejudiced by evidence of his association with Hammond, citing Leonard's reference to Hammond as a gang member on cross-examination. This contention is specious. Leonard testified that he knew Hammond because Hammond was in a "car club." We cannot perceive how such a remark could be prejudicial to defendant. Moreover, the reference occurred after the motion to sever had been made and denied and is therefore irrelevant to our review of whether denial of the motion constituted an abuse of discretion. (*People* v. *Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on other grounds in *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1115.)

The trial court did not err in denying severance.

C. *Alleged Griffin error.*

Defendant contends certain prosecutorial remarks made during closing argument constituted *Griffin* error (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]). In discussing whether defendant had intended to kill Williams, the prosecutor commented, "Do you think [the

evidence] demonstrates an intent to kill plus an overt act toward its completion? I think the evidence shows it does. She didn't die, obviously. That's not the killer's fault. The killer probably thought that she was dead. *We'll never know what he thought.*" (Italics added.)

In arguing the case against Hammond, the prosecutor referred to Hammond's statement but drew from it the inference that, enroute to the crime scene, Hammond was well aware of defendant's objective to commit a robbery: "Now, they're riding side by side from the carwash on 90th and MacArthur all the way to Lakeshore, seven miles. You suppose there's some conversation between the two as to why Mitcham's dressed like he is? You suppose there's some question in Hammond's mind which would give rise to a question of Mitcham, how come you're dressed like that? How come you got winter coats on? How come you have the two coats on? How come you got a bag full of pillow or blanket? How come you're dressed like that? You going to the jewelry store to go shopping? You going to the drugstore? [¶] No. No evidence of any conversation at all. You believe that? You believe that, you believe anything. If you believe, if you believe that Hammond just happened to be in that position to provide Mitcham with a getaway from that robbery, you'll believe anything."

In further argument of the case against Hammond, the prosecutor commented on Hammond's counsel's argument that defendant had met Hammond fortuitously at the intersection. The prosecutor then remarked, "That isn't what Stephan Mitcham said."

Additionally, the prosecutor commented on the defense's failure to present a case: "But don't you think it's interesting that not one witness was called by two defendants? Not one. [¶] There's not one to say that they were somewhere else. There's not one to say that they weren't thinking about or didn't know about the commission of a robbery. Not one to testify about anything. Not one to say that Richard Leonard's a liar, not a witness as to anything." He later continued, "These two men didn't put on a defense because they don't have one. I'm sure that's occurred to you. They don't have a defense. If they had a defense, you'd hear it. There isn't a defense, and you haven't heard a defense. [¶] They were entitled to their day in court . . . and they've had it. They've had their days in court."

Defendant contends these remarks amounted to comments on his failure to testify and thus were prohibited by *Griffin.* At trial, however, defendant's counsel did not object to the prosecutor's comments. Because a timely objection and admonition would have cured any harm caused by these remarks, defendant may not raise the objection for the first time on appeal.

(*People* v. *Carrera* (1989) 49 Cal.3d 291, 320 [261 Cal.Rptr. 348, 777 P.2d 121]; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 758 [175 Cal.Rptr. 738, 631 P.2d 446].)

Moreover, we find no *Griffin* error. "'*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand. The rule, however, does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses.' [Citation.]" (*People* v. *Hovey* (1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776].) Here, the first of these comments by the prosecutor, relating to the attempted murder charge, was a permissible reference to the state of the evidence and the fact that intent may be difficult to prove directly. The prosecutor did not argue that the evidence of defendant's intent to kill was uncontradicted by defendant. (Cf. *People* v. *Murtishaw, supra*, 29 Cal.3d at pp. 757-758.)

The prosecutor made the second comment, regarding Hammond's statement, when arguing the case against Hammond, discussing whether Hammond was an innocent dupe or knew about the robbery and had intended to aid and abet in its commission. The comment referred to the lack of evidence explaining or exculpating Hammond's activities and cannot reasonably be construed as a comment upon defendant's failure to explain the circumstances of his riding in an automobile with Hammond.[8]

The third remark, "That isn't what Stephan Mitcham said," referred to Leonard's testimony that defendant had told him that Hammond had been waiting for defendant with the getaway car, and was not a comment on defendant's failure to testify.

The prosecutor's final comments did not refer to the defendant's failure to testify, but to the failure of the defense to call witnesses to contradict the testimony of the prosecution's witnesses or to offer any evidence in opposition to the prosecution's case. *Griffin* v. *California, supra*, 380 U.S. 609, does not prohibit the prosecution from emphasizing the defense's failure to call logically anticipated witnesses or the absence of evidence controverting the prosecution's evidence. (See *People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213]; *People* v. *Gray* (1979) 91 Cal.App.3d 545, 552 [154 Cal.Rptr. 555].)

D. *Alleged reference to facts outside the record.*

■ Defendant contends the prosecutor, in commenting on Hammond's statement, essentially argued to the jury that defendant and Hammond drove

---

[8]We have no occasion here to decide whether the statement was improper as to Hammond or unfairly penalized Hammond for having redacted his statement at the request of the police.

around Oakland together before the crimes and that the prosecutor engaged in speculation concerning possible discussions between the two men. Defendant contends that because no evidence was received at trial establishing that defendant and Hammond had driven around Oakland together prior to the crimes, the prosecutor's comment improperly alluded to facts outside the record.

Again, defendant's failure to object to the comment at trial precludes his objection on appeal. Moreover, defendant's contention lacks merit. The prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom. (*People* v. *Kelly, supra,* 51 Cal.3d 931, 967.) Here, the prosecutor's comments constituted reasonable inferences drawn from the evidence that Hammond had driven to Lakeshore Avenue prior to the robbery and was observed fleeing with defendant shortly after the robbery.

Defendant also objects to the prosecutor's argument to the jury that the police began looking for the two defendants after connecting the getaway car, a Falcon, to the Falcon Gang. Defendant is correct in contending the record does not support this remark. The remark could not have been prejudicial to his defense, however. Leonard testified he knew Hammond in connection with a car club whose members owned Falcons but that defendant was not a member of the club. The prosecutor's subsequent reference to the Falcon Gang therefore was prejudicial, if at all, to Hammond and not to defendant.

### E. *The trial court's comments on the preliminary hearing.*

■ Defendant contends the trial court's comments to the jury on the preliminary hearing process constituted prejudicial error. During cross-examination of Williams, defense counsel sought to impeach her with her preliminary hearing testimony. The court, apparently on its own initiative, explained to the jury the preliminary hearing process, as follows: "Ladies and gentlemen . . . let me explain what a preliminary examination is. [¶] As I told you before, normally a criminal charge comes into being by the [issuance] of an information. Now it happens in most cases and what happened in this case, a person's arrested, a criminal complaint issues, a preliminary examination is then held and a Magistrate, *a judge in the Municipal Court must make the determination if there's sufficient evidence to hold a person to answer for trial.* [¶] *Now, the standard of proof is not beyond a reasonable doubt, it has to be a reasonable suspicion.* [¶] How does a Municipal Court judge determine that? He determines that by testimony. In other words, people testify, Ms. Williams testified at the preliminary examination. . . ."

Defendant contends that, by the underscored comments, the trial court improperly referred to defendant's guilt and in essence told the jury that at least one judge previously had concluded, after hearing evidence, that defendant was guilty. Defendant's failure to object at trial, however, particularly where (as here) such action would have permitted the court to clarify any possible misunderstanding resulting from the comments, bars his claim of error on appeal. (See *People* v. *Lanphear* (1980) 26 Cal.3d 814, 836 [163 Cal.Rptr. 601, 608 P.2d 689], vacated, affd. 28 Cal.3d 463 [171 Cal.Rptr. 505, 622 P.2d 950].)

Moreover, defendant's argument is refuted by the very language used by the trial court, which correctly explained the preliminary hearing process and the standard of proof employed by the magistrate. (See *People* v. *Lanphear, supra*, 26 Cal.3d 814, 836 [trial court's comments that although someone " 'thinks he's guilty' to start the process, 'what we are here for is to find out whether those charges are true, not whether somebody thinks they are true,' " held not prejudicial].) The court did not indicate to the jury that another judge or anyone else had concluded defendant was guilty. Indeed, rather than create a prejudicial misconception of the preliminary hearing process, the comments tended to eliminate any misconception. Because the court's comments were accurate and nonargumentative, we find no error. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 766 [230 Cal.Rptr. 667, 726 P.2d 113].)

F. *Felony-murder special circumstance.*

The trial court instructed the jury that in order to find the special circumstance charged under section 190.2, subdivision (a)(17)(i), to be true, it had to find that defendant possessed the intent to kill Ormond. At the time of trial, such an instruction was required by *Carlos* v. *Superior Court, supra*, 35 Cal.3d 131, 142. Defendant contends there was insufficient evidence to support the jury's finding of intent to kill, and that the special circumstance finding therefore must be set aside.

Defendant's claim as to the alleged insufficiency of the evidence of his intent to kill has been rendered moot by this court's decision in *People* v. *Anderson, supra*, 43 Cal.3d 1104, 1147, expressly overruling *Carlos* on this point. In *Anderson*, we held "intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abettor rather than the actual killer, intent must be proved." The rule of *Anderson* applies both to crimes committed after the *Anderson* decision and to crimes committed prior to the *Carlos* decision. (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 143, fn. 5 [249 Cal.Rptr. 320, 756 P.2d 1348]; *People* v. *Easter* (1987) 197 Cal.App.3d 183, 185-187 [242 Cal.Rptr. 746].) The criminal conduct here was committed prior to *Carlos*.

██ In the present case, the evidence established either that defendant actually killed Ormond or that he was not at all involved in the crime; there was no evidence that he was only an aider and abetter. Accordingly, intent to kill was not an element of the felony-murder special circumstance charged against defendant, and the trial court was not required to instruct on such intent as an element of the alleged special circumstance. (*People* v. *Hamilton*, *supra*, 46 Cal.3d at pp. 142-143; *People* v. *Easter, supra*, 197 Cal.App.3d 183, 185.) The issue whether there was sufficient evidence to support a finding that defendant possessed the intent to kill therefore is moot.

Defendant contends that adherence to *Anderson, supra*, 43 Cal.3d 1104, in the present case would result in an ex post facto application of the law in violation of the due process provisions of the federal and state Constitutions. We rejected this identical argument in *People* v. *Hamilton, supra*, 46 Cal.3d at page 143, footnote 5, and defendant fails to put forth any reason for us to reexamine that holding.

### G. *Alleged submission of unredacted exhibits to the jury.*

Defendant maintains that three allegedly prejudicial exhibits were submitted to the jury in unredacted form in contravention of the trial court's ruling to redact them. Defendant failed to raise this contention at any point during the trial proceedings or in his briefing on appeal filed nearly three years ago. He raised this contention only recently for the first time, in response to this court's invitation to the parties to file any "supplemental briefs citing authority postdating the briefs on file." As demonstrated below, the record does not support this new contention.

Before the prosecution rested its case, the trial court, outside the jury's presence, discussed with counsel which exhibits were to be received in evidence. People's exhibits 5-A through 5-F were six photographs of Black males comprising a police photographic lineup, one of which (exhibit 5-D) was a photograph of defendant. The back of the latter exhibit bore the signature of several persons who had identified defendant, including Hammond's signature. The back of each of these other photographic exhibits bore the initials of those same persons (including Hammond), apparently to indicate that each of the individuals also had been shown the other five photographs in the series. All counsel agreed that Hammond's signature on the back of exhibit 5-D could not be submitted to the jury. The court and the prosecutor suggested that Hammond's signature as well as his initials could be masked by tape. Defendant's counsel objected that the presence of the tape would lead the jury to speculate that someone else had signed the photograph. The court stated it would reserve until a later time its ruling on the form in which the exhibit would be admitted.

Exhibit 19, a newspaper article reporting the crime, included photographs of defendant and Hammond. When the exhibit was marked for identification, all counsel agreed that only the newspaper photographs of the two defendants would be admitted and that the text of the article would be redacted.

Exhibit 46 was another newspaper article reporting the crime. The court ruled the text of the article was inadmissible and only the headline (which Leonard testified he had read) was admissible.

The prosecution subsequently rested its case and moved the admission of its exhibits into evidence. When the prosecutor offered exhibits 5-A through 5-F, he remarked that "There's a problem with, I believe, photograph 5D. We were to take care of something." The court replied the problem would "be taken care of pursuant to the desires of counsel. There's some writing on the photographs which have nothing to do with it which we'll either take off or cut off. You don't worry about that. The photos will be intact." The photos were then admitted into evidence.

When the prosecutor offered exhibit 19, defendant's counsel said he believed "there were some modifications." The court stated it would "modify" the exhibit, which then was admitted into evidence. The court similarly admitted exhibit 46 "as modified" into evidence.

The court thereafter advised the jury that the prosecution had rested its case and that "[a]ll of these exhibits which have been admitted into evidence you may see and have with you *if you request them*." (Italics added.)

After the jury retired for deliberations, the court sought from counsel a stipulation it could excuse the jurors for meals "or send the exhibits up *if asked for*" (italics added) when counsel were not present. Counsel so stipulated. The clerk's minutes state "[c]ounsel stipulate at each recess and should the jury request exhibits the Court need not reconvene." Neither the reporter's transcript nor the clerk's transcript reflects that the jury requested the exhibits prior to returning their verdicts.

Defendant now contends the three exhibits were submitted to the jurors in unredacted form in contravention of the court's ruling. In support of this contention, defense counsel represents that, in preparation for supplemental briefing, he recently reviewed all exhibits deposited with the superior court clerk. Counsel discovered exhibit 5-D with a piece of tape over Hammond's signature but through which, he contends, the signature still can be perceived; exhibit 19 with the newspaper article text intact with the photographs; and exhibit 46 with the newspaper article text intact with the headline.

Defendant's contention that unredacted exhibits were submitted to the jury is not supported by the record. As demonstrated above, the record does not reflect that exhibits 5-D, 19, or 46 ever were submitted to the jury. The trial court advised the jurors that the exhibits would be submitted to them if the exhibits were requested, but the record does not indicate the jury requested them.

Moreover, the record reflects the clerk was fully aware of her duty, in light of the trial court's ruling, to submit the exhibits in redacted form in the event the jury were to request them. Pursuant to California Rules of Court, rule 12, we ordered on our own motion that the superior court transmit to us the exhibits in question and also the clerk's inventory of the exhibits. Having examined these items, we observe that in the exhibit inventory record, attached to the clerk's entry mark for exhibit 19, is the notation on a separate piece of paper: "photos in evidence *only*—remainder of article not to be given to jury." (Italics in original.) Attached to the entry mark for exhibit 46 is the notation on a separate piece of paper: "headline in evidence *only*— remainder of article not to be given to jury". (Italics in original.) Our examination of exhibit 5-D discloses a piece of opaque tape attached to the back of the photograph, effectively masking the last signature (presumably Hammond's). Contrary to defendant's contention, Hammond's signature is not legible through the tape. The record does not reflect that defense counsel ever suggested to the trial court or the clerk that Hammond's signature still was visible despite the tape affixed to the exhibit.

Under Evidence Code section 664, we presume the clerk "regularly performed" her official duty and submitted to the jury only the admissible portions of any exhibits which they requested. (See *People* v. *Hudson* (1953) 120 Cal.App.2d 870 [262 P.2d 23]; *People* v. *Smith* (1965) 234 Cal.App.2d 404, 407 [44 Cal.Rptr. 430].)

In *Hudson*, the court applied the presumption under the predecessor statute to Evidence Code section 664 in rejecting the defendant's claim that improper matter had been submitted to the jury. There, following a jury trial, the defendant was convicted of armed robbery. On appeal, relying on the clerk's minutes of the trial proceedings reflecting that the "information is read and plea stated" to the jury, defendant argued the clerk had read to the jury the allegations of his prior felony convictions set forth in the information, in violation of Penal Code section 1093. The record, however, did not indicate the clerk had read these specific allegations. In rejecting defendant's argument, the court applied the presumption of Evidence Code section 664's predecessor statute " 'that official duty has been regularly performed,' and the rule that error will not be presumed, but must be shown affirmatively."

(*People* v. *Hudson, supra,* 120 Cal.App.2d at pp. 871-872.) The court concluded, "[i]t must be presumed that the clerk performed his duty and read the information in the manner required by law." (*Ibid.*)

Here, defendant makes no showing to rebut the presumption the clerk performed her official duty with regard to the exhibits. We accordingly presume she performed her duty in accordance with the trial court's ruling.

Thus, the record on appeal does not support defendant's contention that the three exhibits were submitted to the jury or that, if they were, the inadmissible portions were submitted with the admissible portions.

Finally, even if the exhibits were submitted to the jury in unredacted form, such error could not have been prejudicial to defendant. The opaque tape affixed to the back of exhibit 5-D, the lineup photograph of defendant, effectively masks Hammond's signature. The text of exhibit 19, the newspaper article pertaining to the police investigation of the crime, departs from the evidence introduced at trial in only minor respects, such as references to members of the Falcon Gang who "are known for dealing in marijuana and car thefts and burglaries," and statements that "[b]oth Mitcham and Hammond had minor arrest records" and "Mitcham was a known transient with no firm address . . . ." In light of the strong evidence of defendant's guilt, including three eyewitness identifications, there is no reasonable probability (or possibility) that these fairly innocuous comments affected the jury's verdict of guilt. In light of the uncontradicted evidence that defendant bragged about and profited from this brutal robbery-murder, and because additional evidence in aggravation was received at the penalty phase, there is no reasonable possibility the jury would not have imposed the death penalty had it not viewed the text of exhibit 19.

The text of exhibit 46, another newspaper article, refers to Ormond's background as an immigrant from Portugal, as well as to the fact that he was the third member of his generation to be murdered and that he had been pistol-whipped during a previous robbery. Although Ormond's unfortunate history could have tended to evoke sympathy for the victim, the evidence properly introduced at trial would have done so independently. Accordingly, there is no reasonable possibility the jury would not have imposed the death penalty had it not viewed the text of exhibit 46.

H. *Effective assistance of counsel.*

Defendant contends he was deprived of effective assistance of counsel during the guilt phase of the trial. ▮ To establish constitutionally

inadequate representation, a defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People* v. *Haskett* (1990) 52 Cal.3d 210, 248 [276 Cal.Rptr. 80, 801 P.2d 323] (*Haskett II*); *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839]; see *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052].) When a defendant on appeal makes a claim that his counsel was ineffective, the appellate court must consider whether the record contains any explanation for the challenged aspects of the representation provided by counsel. "If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' [citation], the contention must be rejected." (*People* v. *Haskett, supra,* 52 Cal.3d at p. 248; see *People* v. *Ledesma, supra,* 43 Cal.3d at p. 218; *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Defendant has failed to meet his burden of establishing, on the record before us, that his trial counsel was ineffective.

Defendant first complains of his counsel's failure to move for severance of defendant's trial from that of Hammond. As discussed *ante*, defendant's counsel did move for severance but on a basis different from the grounds asserted on appeal. Counsel's failure to move for severance on the grounds presently asserted on appeal might well have resulted from counsel's reasonably assuming that such a motion would have been denied. Hammond's incriminating statement was effectively redacted to eliminate any reference to defendant. There was no evidence of any gang affiliation prejudicial to defendant. Although defendant argues his case was tainted by the evidence against Hammond which, he contends, was much stronger than that against him, there is no showing the theories of defense or trial strategy of the two defendants was in conflict so as to warrant severance.

Defendant next complains of counsel's failure to object to the prosecutor's reference to the Falcon Gang. Because we conclude the reference could not have been prejudicial to defendant, counsel's failure to object was not unreasonable.

Defendant next complains of his counsel's failure to object to the admission of exhibit 45, a newspaper article reporting the crime, which Leonard testified he read before speaking with the police. The article did not refer to defendant, Hammond, or the police investigation of the crime, but only to

the undisputed fact of the shooting of Ormond and Williams. Its admission therefore could not have been prejudicial to defendant. For this reason, and because the trial court overruled the objection of Hammond's counsel to exhibit 45, the failure of defendant's counsel to object does not demonstrate ineffective assistance of counsel.

Defendant next complains of counsel's failure to object to the qualifications of the prosecution's criminalist as a ballistics expert or to his testimony relating to the use of a pillow as a "silencer," or to Leonard's testimony that defendant possessed a .22-caliber revolver that defendant said he had used in the robbery. Defendant fails to relate, however, the objections which he contends should have been asserted, and therefore fails to demonstrate deficient performance. Furthermore, the record sheds no light on whether his counsel's failure to object was based upon sound trial tactics or resulted from inexcusable oversight. The record in fact provides a satisfactory explanation for the failure to object to the criminalist's qualifications—the witness testified he had qualified more than 100 times as an expert in the field of firearms identification and ballistics. Under *Ledesma, supra,* 43 Cal.3d 171, and *Pope, supra,* 23 Cal.3d 412, defendant's claim that counsel was ineffective for failing to object must fail.

██ Defendant next complains his counsel was ineffective in electing to present no defense case. Defendant focuses on his counsel's comment, following the prosecutor's opening statement, that he would reserve his opening statement, and counsel's subsequent decision to present no opening statement or evidence.

The decisions whether to waive opening statement and whether to put on witnesses are matters of trial tactics and strategy which a reviewing court generally may not second-guess. (See *People* v. *Pangelina* (1984) 153 Cal.App.3d 1, 6-9 [199 Cal.Rptr. 916].) Reasonably competent counsel could have determined to wait to hear the prosecution's case before deciding whether to present a defense. Defendant's counsel could have determined that the defense's strongest argument was that the prosecution had failed to prove its case beyond a reasonable doubt. He in fact took this position during closing argument. (See discussion, *post.*) In any event, because the record does not reveal why counsel elected not to present a defense, defendant's claim must fail.

Defendant next complains his counsel was ineffective in failing to object to instances of prosecutorial misconduct during closing argument, including *Griffin* error, discussed *ante.* Our conclusion that there was no such misconduct prejudicial to defendant (see pt. C, *ante*) defeats this claim.

■ Defendant finally complains his counsel unnecessarily conceded during closing argument that the prosecution had established that whoever shot Williams possessed the intent to kill. In closing argument, defendant's counsel devoted substantial argument to (1) the defense of misidentification; and (2) the lack of evidence supporting the special circumstance of murder in the commission of a robbery, because (under *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131) whoever committed the crimes had not intended to kill *Ormond.* As to the shooting of Williams, counsel stated: "[I]t is not particularly critical what the particular elements of attempted murder are. It would appear that the shooting of Yvette Williams constituted an attempted murder, whatever the hypertechnical elements of attempted murder might be in that instance. [¶] The question remains whether Stephan Mitcham was the perpetrator of those offenses." Shortly after this statement, counsel attempted to define the element of intent, and then asked: "Well, what do we know about the shooting of James Ormond? Whoever did it, Stephan Mitcham or someone else, what do we know about the shooting of Jim Ormond relative to whether it was intended or not?" He proceeded: "I don't have any question in my mind about whether the shooting of Yvette Williams was intentional."

Defendant contends that by so conceding the issue of the gunman's intent to kill Williams, his counsel unnecessarily, on the attempted murder charge, limited his defense to misidentification. He contends it is inconceivable that such a concession could have been premised upon any rational or informed tactical decision. We disagree.

The record reflects counsel made a tactical decision to concede that whoever committed these crimes was guilty of the first degree murder of Ormond under the felony-murder rule, and of the attempted murder of Williams. In so doing, he sought to contrast the shooting of Williams from that of Ormond, i.e., to argue that as to the former there was evidence the gunman had the intent to kill, whereas as to the latter there was no such evidence. The concession of intent as to the shooting of Williams was not unreasonable in light of the substantial weight of the evidence on this issue, and counsel's desire to focus on the defense of misidentification and thus maintain his credibility with the jury. He thereby was able to follow his apparent strategy of making the alternative arguments that (1) his client did not commit the shootings, and (2) if defendant did shoot the two victims, he did not intend to kill Ormond and thus would not be subject to the death penalty. In *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149], we noted that good trial tactics often demand complete candor with the jury, and that in light of the weight of the evidence incriminating a defendant, an attorney may be more realistic and effective by avoiding

sweeping declarations of his or her client's innocence. (*Id.*, at pp. 292-293; see *People* v. *Wade* (1988) 44 Cal.3d 975, 988 [244 Cal.Rptr. 905, 750 P.2d 794].)

The record fails to establish defendant's claim that he was deprived of the effective assistance of counsel during the guilt phase of the proceedings.

## II. Penalty Phase Issues

### A. *Excusal of jurors.*

Defendant contends the trial court erred in excusing for cause six jurors because of their views adverse to the death penalty. ▆▆▆ The standard of review we employ in reviewing such a claim is that stated in *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844] (*Witt*), which "clarified" the earlier decision of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. Under *Witt*, a prospective juror may be excused for cause if that juror's views on capital punishment would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852], fn. omitted.)

Defendant urges that we not apply *Witt* retroactively. We already have rejected this contention. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Wright* (1990) 52 Cal.3d 367, 418, fn. 16 [276 Cal.Rptr. 731, 802 P.2d 221].)

In reviewing the excusal of jurors under the *Witt* standard, "if the prospective juror's responses are equivocal, i.e., capable of multiple inferences, or conflicting, the trial court's determination of that juror's state of mind is binding. [Citations.] If there is no inconsistency, the only question being whether the juror's responses in fact demonstrated an opposition to (or bias in favor of) the death penalty, we will not set aside the court's determination if it is supported by substantial evidence and hence is not clearly erroneous. [Citation.]" (*People* v. *Cooper, supra*, 53 Cal.3d 771, 809.)

▆▆▆ As to prospective jurors Northrop and Tagliarini, the record establishes the parties, including defendant, stipulated to their excusal. Because of the stipulation, the trial court was not called upon to decide whether these prospective jurors could properly be excused for cause. The stipulation thus bars defendant from challenging the excusals on appeal. (See *People* v. *Coogler* (1969) 71 Cal.2d 153, 174-175 [77 Cal.Rptr. 190, 454 P.2d 686].)

▆▆▆ The record supports the trial court's rulings as to the remaining prospective jurors, Wright, Higares, McGinley, and Arnold. Although Wright

indicated at the outset of voir dire that he had no views concerning the death penalty that would compel him to impose a life sentence instead of the death penalty, he stated subsequently he could never take a person's life and would not impose the death penalty. Higares could not anticipate any circumstances under which he could vote for the death penalty. McGinley stated he would never vote for the punishment of death, and Arnold believed he could not condemn anyone to death. Defendant directs our attention to other equivocal or conflicting statements, emphasizing prospective jurors' use of words such as "I think" to qualify their answers. Such language, however, does not undermine a finding under *Witt, supra,* 469 U.S. 412, that the juror is substantially impaired from performing his or her duties. (*People v. Guzman* (1988) 45 Cal.3d 915, 956 [248 Cal.Rptr. 467, 755 P.2d 917].) Moreover, the trial court resolved these conflicts and ambiguities against defendant, which resolution is binding on this court. (*People v. Cooper, supra,* 53 Cal.3d 771, 809.)

### B. *Evidence of Williams's postcrime trauma.*

Defendant asserts the trial court erred in admitting evidence of the emotional and psychological trauma suffered by Williams subsequent to the crimes. At trial, defendant objected to the introduction of such evidence, arguing it did not relate to the capital offense but only to the shooting of Williams, and specifically that this evidence did not relate to the circumstances of the capital crime at the time it was committed. He argued that for these reasons, the evidence was not probative of any factor listed under section 190.3, and therefore was inadmissible.

The trial court overruled the objection, stating such evidence was admissible as evidence of the circumstances of the crime (§ 190.3, factor (a)). Williams then testified at length regarding her extensive hospitalization for psychiatric problems, two nervous breakdowns, suicide attempts, hysteria, phobia of entering small stores, and continuing inability to work.

■ We find no error. In determining the appropriate punishment, the jury's resolution of the question whether the defendant should be put to death turns not only upon the facts but upon the jury's moral assessment of those facts. In this process, among the most significant considerations are the circumstances of the underlying crime. (§ 190.3, factor (a); *People v. Marshall* (1990) 50 Cal.3d 907, 929 [269 Cal.Rptr. 269, 790 P.2d 676]; *People v. Haskett* (1982) 30 Cal.3d 841, 863-864 [180 Cal.Rptr. 640, 640 P.2d 776] (*Haskett I*).) Assessment of, and reaction to, the crime from the victim's standpoint is highly relevant to this consideration. (*Haskett II, supra,* 52 Cal.3d 210, 247; *People v. Marshall, supra,* 50 Cal.3d at p. 929; *People v.*

*Lewis* (1990) 50 Cal.3d 262, 284 [266 Cal.Rptr. 834, 786 P.2d 892].) Evidence of the impact of the defendant's conduct on victims other than the murder victim is relevant if related directly to the circumstances of the capital offense. (See *People* v. *Clark* (1990) 50 Cal.3d 583, 629 [268 Cal.Rptr. 399 [789 P.2d 127]; *Haskett I, supra,* 30 Cal.3d at pp. 863-864.)

In *Haskett I,* we held the prosecution's invitation to the jurors to identify with the surviving victim of an attempted murder, who also had witnessed the murder of her two sons, and to imagine the suffering the defendant's acts had inflicted upon her, was appropriate at the penalty phase. (*Id.,* at pp. 863-864.) Similarly, in *People* v. *Clark, supra,* 50 Cal.3d 583, we held that the impact of a defendant's homicidal conduct on persons injured but not killed by that conduct is relevant to the penalty decision. (*Id.,* at p. 629).

In the present case, Williams's testimony as a surviving victim of defendant's attempted murder, describing the psychological and emotional trauma suffered by her as a direct result of defendant's homicidal conduct, related to the nature and circumstances of the capital offense. That her suffering continued long after the shootings does not alter the fact it constituted a circumstance of the crime. The evidence therefore was relevant to factor (a) under section 190.3. Although Williams's testimony would naturally have tended to arouse emotion and evoke strong feelings of sympathy for her condition, it was not so inflammatory as to have diverted the jury's attention from its proper role or invited an irrational response. In short, the testimony in question did not undermine the fundamental fairness of the penalty-determination process.

Defendant further contends that admission of Williams's testimony violated the proscription of *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207], which limited the admissibility of "victim impact" statements. During the pendency of this appeal, however, the high court in *Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597], overruled *Booth* and *Gathers* to the extent those decisions held that the federal Constitution prohibits a state from authorizing the admission of victim-impact evidence. (*Id.,* 501 U.S. at p. __ [115 L.Ed.2d at pp. 736-737, 111 S.Ct. at p. 2609]; see *People* v. *Edwards* (1991) 54 Cal.3d 787, 833 [1 Cal.Rptr.2d 696, 819 P.2d 436].) Moreover, we previously held that the holdings in *Booth* and *Gathers* did not extend to preclude evidence or argument concerning the nature and circumstances of the capital offense. (*People* v. *Benson, supra,* 52 Cal.3d at p. 797; *People* v. *Marshall, supra,* 50 Cal.3d 907, 929.)

Defendant further contends the prosecution failed to give pretrial notice of Williams's post-crime-trauma testimony in violation of the notice requirement of section 190.3, and that defense counsel was "surprised" by her

testimony. The record does not support this contention. The record indicates defense counsel not only was not surprised, but, in anticipation of the testimony, had prepared argument in support of the objection, discussed *ante*, that her testimony was irrelevant to any factor under section 190.3. Presumably, for this reason, defense counsel did not object to her testimony on the ground of lack of notice.

Defendant finally contends that Williams's testimony should have been excluded under Evidence Code section 352 as more prejudicial than probative. Defendant's failure to object on this ground at trial, however, bars him from raising the issue on appeal. (*People* v. *Green, supra*, 27 Cal.3d at p. 22, and fn. 8.)

C. *Lorna Robinson's unavailability as a witness.*

Defendant contends he was deprived of his Sixth Amendment rights of confrontation and cross-examination by the trial court's ruling finding Lorna Robinson to be unavailable as a witness and allowing her preliminary hearing testimony in another criminal proceeding to be read to the jury.

Evidence Code section 1291, subdivision (a)(2), creates an exception to the hearsay rule permitting the use at trial of former testimony of a declarant "unavailable as a witness," provided "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." Evidence Code section 240 in turn defines "unavailable as a witness" to include a witness who is "unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity." (Evid. Code, § 240, subd. (a)(3).)

In the prosecution of the 1983 Lucky store robbery, Lorna Robinson testified at the preliminary hearing, making an in-court identification of defendant as the robber. She also testified that she had identified defendant from a lineup at the police station.

The record indicates that at the outset of the penalty phase in the present case, Robinson was present in court pursuant to a subpoena to testify as a witness at the prosecution's case-in-chief, but, because of her emotional distress, did not wish to testify. The record further indicates that both counsel for the prosecution and the defense sought to examine or to have the court examine this witness to determine whether she should be deemed unavailable as a witness under Evidence Code section 240, so that her preliminary

hearing testimony would be admissible. Defendant's counsel, after examining Robinson, advised the court he might stipulate to her being designated as unavailable. In response to further questioning by the court, Robinson testified she suffered from an emotional condition that had begun approximately six years earlier. She had been "okay" at the preliminary hearing, but, at the latest onset of her condition on April 18, she had broken out in a body rash and had required emergency care. Were she forced to testify, this would have a "[q]uite severe" emotional impact upon her.

After observing Robinson testify, the trial court noted that during questioning she "would periodically sob, breathe hard, have some slight tremor or shaking," but otherwise appeared to understand the nature of the questions. The court received into evidence a note from a physician stating that, in his opinion, "it would not be in Lorna Robinson's best interests, healthwise, to testify in court at this time. She is under extreme emotional pressure presently."

The trial court stated it was prepared to rule unless either counsel wished to speak. Both the prosecutor and defense counsel submitted the matter of Robinson's designation as an unavailable witness to the court without argument or objection. The court ruled Robinson was unavailable as a witness under Evidence Code section 240 and that the transcript of her preliminary hearing testimony was admissible. The transcript of Robinson's preliminary hearing testimony subsequently was read into the record, without objection by defendant's counsel.

Defendant contends the trial court erred in finding Robinson was unavailable as a witness and in admitting her preliminary hearing testimony. He also objects to the manner in which Robinson's testimony was read to the jury by a secretary of the district attorney's office. These issues may not be raised on appeal, however, in view of defendant's failure to raise any objection whatsoever at trial to the admission of this former testimony, either at or prior to the Evidence Code section 240 hearing conducted at the prosecution's request, or at the time the testimony was read into the record. (*People* v. *Green, supra,* 27 Cal.3d at p. 22; cf. *People* v. *Morris* (1991) 53 Cal.3d 152, 190 [279 Cal.Rptr. 720, 807 P.2d 949] [defendant's *in limine* motion was sufficient manifestation of objection to preserve record on appeal].) We observe that the failure of defendant's counsel to object may have been based upon a rational tactical determination that the reading of testimony from a transcript was preferable, from the defense standpoint, to the live testimony of an obviously distressed witness.

Defendant further contends the trial court should have considered alternative solutions to the problem of Robinson's unavailability as a witness. At

trial, however, he neither suggested nor requested any alternatives for the court's consideration, such as a continuance or court appointment of a physician to examine the witness. The trial court had no obligation to pursue such alternatives on its own initiative.

### D. *Defendant's right to counsel at the postlineup interview.*

Defendant asserts the trial court erred in admitting evidence of Robinson's identification of him at a police lineup and her in-court identification of him at the preliminary hearing, contending the identifications were tainted by a violation of his *Wade-Gilbert* rights (*United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]). He argues such violation occurred when, a week after the lineup, a police officer, in the absence of defendant's counsel, interviewed Robinson and obtained from her a statement concerning her earlier identification of defendant at the lineup.

Defendant's failure at trial to articulate this specific objection to the evidence of identification precludes his raising the issue on appeal.[9]

Moreover, we find no error. At the hearing on defendant's motion to exclude the evidence of identification, Oakland Police Officer Politzer testified that on April 20, 1983, he conducted a lineup to determine whether Robinson could identify the robber. Both of defendant's counsel were present when Robinson identified defendant as the robber, and at all portions of the lineup procedure. In the presence of defendant's counsel, Robinson completed the lineup card, marking defendant's number with a question mark, and signing the card. Defendant's counsel voiced no objection to the lineup procedure. When Robinson inscribed the question mark, defendant's counsel made a comment to the effect that the identification was "weak."

One week later, on April 27, Officer Politzer went to the Lucky store, obtaining a written statement from Robinson concerning her identification. He wanted to have her explain the question mark. He had not spoken with

---

[9]The record reflects the trial court conducted a "*Wade-Gilbert*" hearing outside the presence of the jury on a defense motion *in limine* relating to Robinson's preliminary hearing testimony. At the hearing, defense counsel objected to the evidence of identification on the ground the lineup procedure had been impermissibly suggestive. He also objected to the admission of Robinson's subsequent statement to the police on the ground it constituted inadmissible hearsay. The record reflects that although defendant's counsel speculated that the fact of the subsequent police interview "brings People versus Williams into play," he did not make the specific objection he now raises, that evidence of the lineup and in-court identifications was inadmissible because the identifications were tainted by the subsequent interview of Robinson. Indeed, defendant's counsel advised the court he had "no problem with the April 20th question mark coming in . . . ."

Robinson at the time of the lineup concerning her identification, because it was "standard practice" in his office not to discuss lineup details in the presence of defense counsel. Defendant's counsel received no prior notice of, and was not present at, the April 27 interview.

In the written statement made on April 27, Robinson apparently declared that she was "95 percent sure" of her identification of defendant. The trial court sustained defendant's objection to the admission of the April 27 statement on the ground of hearsay, but ruled the evidence of Robinson's lineup and in-court identifications of defendant were admissible.

Defendant contends the lineup identification procedure was not complete until the April 27 interview, when Robinson explained her identification and the question mark to Officer Politzer. He argues that for this reason, he had a right to have his counsel present at the interview, and the failure to notify his counsel of the interview violated his *Wade-Gilbert* rights. Accordingly, he contends, evidence of the lineup identification as well as the in-court identification, which allegedly was a tainted product of the lineup identification, should have been excluded.

The premise of defendant's argument—that the lineup identification was not complete until the April 27 interview—is plainly incorrect. The lineup identification procedure was complete when Robinson filled out and signed the identification card, indicating her identification of defendant, qualified by a question mark. (See *People* v. *Perkins* (1986) 184 Cal.App.3d 583, 591 [229 Cal. Rptr. 219].)

Defendant's premise is not supported by *People* v. *Williams* (1971) 3 Cal.3d 853 [92 Cal.Rptr. 6, 478 P.2d 942], upon which he relies. In *Williams*, the defendant's attorney was present in the viewing room with the witness while the lineup was being conducted. The witness then was taken outside the viewing room for the purpose of making his identification. The request of the defendant's counsel to be present and observe any identification made by the witness was denied as being against the policy of the sheriff's department. We held that under the circumstances of the particular case, the exclusion of defense counsel from the *actual identification* violated the defendant's right under *Wade* and *Gilbert* to have counsel present at the lineup. We cautioned, however, that we were not extending the right to counsel beyond the actual identification procedure: "Our holding in this case should not be interpreted to create a requirement that defense counsel must be present whenever a witness whose testimony may be used as part of the prosecution's case at trial is interrogated. Such an interpretation of the decision would be an unwarranted assumption." (*Id.*, at p. 857.)

*Williams, supra,* 3 Cal.3d 853, holds that the right to counsel at a police lineup extends to the time the witness declares whether or not he or she can identify a particular person as the perpetrator of the crime. Thus, the present case involves no violation of our holding in *Williams.* As we have stated, the entire identification procedure was completed on April 20. After that point, defendant's counsel had no more right to be present at any interview of Robinson than counsel would have at *any* nonconfrontational identification by a victim. (See *People* v. *Lawrence* (1971) 4 Cal.3d 273, 278-280 [93 Cal.Rptr. 204, 481 P.2d 212]; *People* v. *Perkins, supra,* 184 Cal.App.3d at p. 591.) Persons charged with criminal conduct do not possess the right to be represented by counsel at every pretrial interview between the prosecution and its witnesses, particularly where the defense also has the ability through discovery or otherwise to ascertain the identity and whereabouts of the prosecution's witnesses and to seek to question them. (*United States* v. *Ash* (1973) 413 U.S. 300, 317-318 [37 L.Ed.2d 619, 631, 93 S.Ct. 2568]; see *United States* v. *Tolliver* (2d Cir. 1978) 569 F.2d 724, 728 [part of the rationale for the holding of federal decisions that defense counsel need not be present at the moment of identification is that the witness is made available to defense counsel thereafter].)

Defendant's contention that the right to counsel extends beyond the lineup identification procedure to subsequent interviews with the witness constitutes the "unwarranted assumption" proscribed by *Williams, supra,* 3 Cal.3d 853. Defendant's counsel was present at the preliminary hearing and presumably was able at that time to cross-examine Robinson concerning the question mark and any other circumstances which might impugn her identification of defendant. (See *People* v. *Lawrence, supra,* 4 Cal.3d at pp. 278-279; *Doss* v. *United States* (9th Cir. 1970) 431 F.2d 601, 603-604.)

Defendant attaches significance to Officer Politzer's testimony that he was acting pursuant to police policy in choosing not to discuss the identification or interview Robinson in the presence of defendant's counsel. Such a policy, however, did not violate defendant's right to counsel and therefore did not taint the validity of the identification.

No violation of defendant's right to counsel having occurred during the lineup identification procedure, the trial court properly admitted evidence of the lineup identification as well as the in-court identification.

 E. *Admission of evidence of the Vogue Fashion robbery.*

Defendant contends the admission of evidence of the Vogue Fashion robbery, upon reopening of the prosecution's case-in-chief at the penalty

phase, violated the notice requirements of section 190.3. He also contends the evidence was improperly admitted as rebuttal to the defense's evidence in mitigation.

■■■■■ We conclude that, although the evidence was improperly admitted upon reopening of the prosecutor's case-in-chief, the evidence was properly received as rebuttal.

On April 30, 1984, the prosecution commenced its case-in-chief at the penalty phase. On May 2, the prosecution rested, and the defense commenced its case. On May 3, during the cross-examination of Dr. Lerner (the toxicologist who testified regarding the effects of PCP) and shortly before the defense concluded the presentation of its evidence in mitigation, the prosecutor sought to examine this witness concerning a hypothetical situation.

Outside the presence of the jury, the prosecutor made an offer of proof, advising the court of his intention to offer evidence of the Vogue Fashion robbery in rebuttal to Dr. Lerner's testimony. The prosecutor stated that at the beginning of trial (in Dec. 1983), he had been unaware of the robbery (which occurred in Dec. 1982) and had learned of it only one week or ten days earlier. The prosecutor had spoken with Ms. Clar, the victim, who identified defendant from a photographic lineup as the robber. She told the prosecutor that in April 1983, when she saw a photograph of defendant in the newspaper in connection with the robbery-homicide at Ormond's Jewelry Store, she telephoned the Oakland Police Department, informing an officer that the man depicted in the newspaper photograph was the man who had robbed her. Two officers contacted her at that time, but "somehow in the shuffle of [one of the officer's] becoming a lieutenant and no longer being involved in Robbery, the case was not pursued by them through investigation and charging." For this reason, the prosecutor maintained, only recently had he been apprised of the Vogue Fashion robbery, and had he known about the robbery prior to trial he would have given notice as he did of the Lucky store robbery. He offered evidence of the Vogue Fashion robbery as rebuttal, as to which the notice requirement is inapplicable. (§ 190.3.)

Defendant objected to this evidence on the grounds it should properly have been introduced as part of the prosecution's case-in-chief at the penalty phase, and the untimely notice violated the provisions of section 190.3. The trial court ruled the evidence was admissible because the prosecutor "just found it within the week" and as rebuttal evidence.

The prosecutor then continued with his cross-examination of Dr. Lerner, during which the toxicologist acknowledged that the circumstances of the

Vogue Fashion robbery did not indicate PCP use. The defense rested that same day. When trial resumed with the prosecution's presentation of rebuttal evidence, Ms. Clar testified to the Vogue Fashion robbery, identifying defendant as the robber.

■ Section 190.3 mandates that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation."

"The purpose of the statutory notice [under section 190.3] is to advise an accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty trial." (*People* v. *Miranda, supra,* 44 Cal.3d at p. 96.) We have construed the phrase "prior to trial" to mean before the cause is called to trial. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 879 [277 Cal.Rptr. 122, 802 P.2d 906].) We also have held that where the prosecution learns of evidence it intends to use in aggravation at the penalty phase for the first time after trial has commenced, exclusion of this evidence under section 190.3 is not necessarily compelled. (*People* v. *Jennings* (1988) 46 Cal.3d 963, 987 [251 Cal.Rptr. 278, 760 P.2d 475].) Under such circumstances, the defendant is entitled to prompt notice of the newly discovered evidence, and, if necessary, to a reasonable continuance to enable him or her to prepare to meet that evidence. If the prosecution's delay in affording notice is unreasonable or unexcused, or if the delay would prejudice the defense, the court must exclude the evidence. (*Ibid.;* see *People* v. *Daniels, supra,* 52 Cal.3d at pp. 879-880; *People* v. *Howard* (1988) 44 Cal.3d 375, 425 [243 Cal.Rptr. 842, 749 P.2d 279].) Of course, if the evidence is properly introduced as rebuttal, there is no requirement of prior notice. (§ 190.3.)

The Attorney General initially argues that the trial court properly admitted the evidence as a permissible reopening of the prosecution's case-in-chief, because the prosecution had learned only belatedly of the incident, without any fault on its part. The approximate seven-month delay between the date Ms. Clar contacted the police (after seeing a photograph of defendant in the newspaper) and the date trial commenced, however, apparently was attributable to negligence on the part of the police department in failing to pursue its investigation. Moreover, the prosecutor learned of the robbery at least one week prior to the testimony of Dr. Lerner, and *prior to the prosecution's commencement of its case-in-chief,* but without explanation delayed notifying the defense until *after* the prosecution had rested its case-in-chief and the defense had called Dr. Lerner to testify. Therefore, the prosecutor apparently

had the opportunity to give notice and to introduce evidence of the robbery prior to the close of its case-in-chief, but inexplicably failed to do so. The record thus indicates an unexcused delay by the prosecution in notifying the court and defense counsel of the evidence of the Vogue Fashion robbery. For this reason, the record does not support the admission of this evidence upon reopening of the prosecutor's case-in-chief.

 Although the evidence of the Vogue Fashion robbery was not admissible upon reopening of the prosecution's case-in-chief, it was properly admissible as rebuttal. Dr. Lerner testified on direct examination that defendant's behavior at the time of his December 1982 drug-related arrests, as described in the police reports of the arrests, was partially consistent with the use of PCP. By presenting this testimony, along with the testimony of the witness who testified that a month before the present crime defendant did not seem to be himself but appeared to be under the influence of "angel dust," the defense apparently was attempting to suggest to the jury that defendant may have been acting out of character and under the influence of PCP when he committed the crimes involved in the present case. Evidence of defendant's calculated and purposeful behavior during the Vogue Fashion robbery, which Dr. Lerner conceded was not consistent with PCP use, tended to rebut the inference, implicit in the defense evidence, that defendant would commit such criminal conduct only when under the influence of PCP.

Because rebuttal evidence does not require prior notice (§ 190.3.), the prosecution's failure to afford notice of the Vogue Fashion robbery did not preclude the admission of this evidence in rebuttal to Dr. Lerner's testimony.

F. *Rebuttal evidence of juvenile misconduct.*

 Defendant claims error in the admission of rebuttal evidence of his juvenile misconduct and his entire juvenile court file. He challenges the admission of such evidence on the grounds it violated section 190.3's notice requirement, did not fall within the scope of any aggravating factor under section 190.3, pertained to events too remote in time from the present crime, and was excludable under Evidence Code section 352. Defendant, however, not only failed to object at trial on these grounds, but stipulated to the admission of the juvenile court file which documented the juvenile misconduct. He is therefore barred from raising this claim on appeal.

Moreover, defendant's objections lack merit because the evidence of his juvenile misconduct was admissible as proper rebuttal to the defense's evidence in mitigation. Evidence of a defendant's good character is admissible under factor (k) of section 190.3 to extenuate the gravity of the crime.

(*People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782].) By introducing evidence of good character, a defendant places his or her character in issue, thus opening the door to prosecution evidence tending to rebut that "specific asserted aspect" of the defendant's character. (*People* v. *Rodriguez, supra*, 42 Cal.3d 730, 791-792, and fn. 24; see *People* v. *Burton* (1989) 48 Cal.3d 843, 860 [258 Cal.Rptr. 184, 771 P.2d 1270].) Generally, the scope of bad character evidence offered in rebuttal must relate directly to the particular character trait concerning which the defendant has presented evidence. (*People* v. *Rodriguez, supra*, 42 Cal.3d at p. 792, fn. 24; see *People* v. *Siripongs* (1988) 45 Cal.3d 548, 576-578 [247 Cal.Rptr. 729, 754 P.2d 1306].)

For example, in *People* v. *Siripongs*, we held that a defendant's introduction of evidence that he was a devout Buddhist, and that one of the characteristics of a devout Buddhist is truth or honesty, would justify the prosecution's introduction of evidence of defendant's prior convictions from Thailand involving dishonesty. (45 Cal.3d at pp. 576-578.)

Here, defendant presented numerous witnesses who testified to his good character and reputation in elementary and junior high school. One witness testified defendant was a good student, kind to others, and respectful of his elders, and had been a class speaker at his graduation. Another witness testified defendant was an excellent student, highly regarded by others, and popular, and got along well with everyone; on cross-examination, this witness responded affirmatively when questioned whether defendant was honest, kind, and nonviolent.

The rebuttal evidence of defendant's acts of delinquency, including incidents of violence, directly related to this general picture of a well-behaved youth presented by the defense. Although we cautioned in *Rodriguez* that "the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf" (42 Cal.3d at p. 792, fn. 24), here defendant's good character evidence was not limited to any singular incident, personality trait, or aspect of his background. The defense evidence painted an overall picture of an honest, intelligent, well-behaved, and sociable person incompatible with a violent or antisocial character. The breadth and generality of this good character evidence warranted rebuttal evidence of the scope offered. (Cf. *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1192-1193 [270 Cal.Rptr. 286, 791 P.2d 965].)

Because the prosecution's evidence was proper rebuttal, defendant's objections to its admission are not well taken. Rebuttal evidence is not subject

to the notice requirement of section 190.3 and need not relate to any specific aggravating factor under section 190.3. (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 791.) That the juvenile court adjudications and declaration of wardship were not necessarily evidence of criminal activity involving force or violence under factor (b), or prior felony convictions under factor (c) of section 190.3, is therefore irrelevant. (42 Cal.3d at pp. 791-792.) Furthermore, that the juvenile misconduct did not result in criminal convictions is similarly irrelevant. The rebuttal evidence was not necessarily offered to establish past criminal activity on defendant's part but rather to rebut defendant's claim of good character. (*Id.,* at p. 792.) The prosecution's evidence was highly probative of defendant's character as a juvenile, and therefore the trial court would not have abused its discretion in admitting it even had objection been made under Evidence Code section 352. Finally, the rebuttal evidence pertained to the same period of time involved in the evidence offered by the defense in mitigation and therefore necessarily was not too remote.

Defendant raises a similar objection to the prosecutor's references to his juvenile record in cross-examining defense witnesses, asserting that evidence of his juvenile misconduct exceeded the scope of direct examination. We reject this contention for the same reason we uphold the admission of the prosecution's rebuttal evidence. The evidence of defendant's juvenile misconduct, including his assaults on the bus driver and the construction worker and the "hot-wiring" of motorcycles, directly related to the defense witnesses' testimony that defendant was honest, kind, well-behaved, and respectful of others.

■ Defendant finally contends the trial court was required to instruct the jury sua sponte that the evidence of his juvenile misconduct could be considered only as rebuttal to his evidence in mitigation and not as evidence in aggravation. He argues that without such instruction the jury likely considered as evidence in aggravation the evidence of his juvenile misconduct which, he contends, did not correspond to any factor under section 190.3. As we explain, defendant's contention lacks merit.

Under the applicable death penalty law, the prosecution's case at the penalty phase was limited to evidence relevant to the factors listed under section 190.3. (*People* v. *Boyd, supra,* 38 Cal.3d 762, 772-773.) The trial court in this case properly instructed the jury on the specific factors to be considered in aggravation. If the evidence of defendant's juvenile misconduct did not correspond to any of the factors enumerated by the trial court, we must assume the jury followed the court's instructions and did not consider such evidence in aggravation. To the extent any of the evidence of

juvenile misconduct did correspond to a listed factor (such as factor (b)), however, the applicable statutes permitted the jury to consider it in aggravation, even though the evidence was admitted in rebuttal. Defendant cites no authority that would support a contrary conclusion. From the foregoing it is readily apparent that the trial court had no sua sponte duty to give the instruction presently proposed by defendant. If defendant desired a more refined instruction to the effect that the jury could not consider rebuttal evidence in aggravation if such evidence did not correspond to any of the specific factors listed by the court, he was under an obligation to request it.

### G. *Instructions on aggravating and mitigating factors.*

In instructing the jury on the statutory list of aggravating and mitigating factors, the trial court, at defendant's request, deleted certain mitigating factors not supported by the evidence.

The court was not required to make these deletions. We repeatedly have stated that although not every one of the factors under section 190.3 may be applicable to the circumstances of a defendant's crime, they all are relevant to the jury's determination of the appropriate penalty in that they focus the attention of the jury on the range of factors to be considered in all capital sentencing. (*People* v. *Bell* (1989) 49 Cal.3d 502, 551-552 [262 Cal.Rptr. 1, 778 P.2d 129]; *People* v. *Williams, supra*, 44 Cal.3d at pp. 959-960; *People* v. *Miranda, supra*, 44 Cal.3d at pp. 104-105.)

Defendant nevertheless claims that the trial court should have made an additional deletion by *not* instructing the jury to consider the factor of "the presence or absence of any prior felony conviction . . . ." Defendant argues that because there was no evidence he had suffered a prior felony conviction, the court should have referred only to the *absence* of any prior felony conviction.

Defendant's claim lacks merit. If, as we repeatedly have held, *none* of the inapplicable factors need be deleted in instructing the jury, then necessarily the court was not required to make the particular deletion urged by defendant. The reference to both the presence or absence of prior felony convictions could not have misled the jury. The absence should have been evident to a reasonable juror (see *People* v. *Ruiz* (1988) 44 Cal.3d 589, 619 [244 Cal.Rptr. 200, 749 P.2d 854]), and neither the prosecutor nor the court ever suggested defendant had suffered a prior felony conviction. We find no error.

### H. *Instructions on other-crimes evidence.*

At the penalty phase of a capital trial, a defendant is entitled to an instruction to the effect that the jury may consider evidence of other crimes

introduced as an aggravating factor under section 190.3, factor (b), only when the commission of the other crimes has been proved beyond a reasonable doubt. (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1202 [240 Cal.Rptr. 666, 743 P.2d 301]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 280 [221 Cal.Rptr. 794, 710 P.2d 861].) Defendant contends the instructions given in the present case did not comply with this rule. His contention has no merit. The court's instructions included the following: "The District Attorney has introduced evidence of criminal activity which involved the use of force and violence or the threat of force and violence. [¶] It is for you, the jury, to determine whether the evidence shows beyond a reasonable doubt the use of force and violence or threats of force and violence. [¶] Facts in aggravation must be proved beyond a reasonable doubt. [¶] And, again, reasonable doubt is defined as follows: . . ." The foregoing instructions adequately comport with the requirements of *Gates* and *Davenport*.

■ Defendant next contends the court erred in failing to give an instruction sua sponte listing the specific other crimes relating to factor (b) of section 190.3, which the jury could consider in aggravation. Defendant apparently relies on the suggestion in *People* v. *Robertson* (1982) 33 Cal.3d 21, 55, footnote 19 [188 Cal.Rptr. 77, 655 P.2d 279], that the prosecution should request an instruction specifically enumerating the other crimes which the jury may consider as aggravating circumstances in determining penalty, and that the jury should be instructed not to consider any additional crimes in fixing the penalty. The trial court did not give such instruction at defendant's trial. The prosecutor, however, during closing argument explicitly identified the evidence to be considered as other crimes under factor (b), and the jury instructions (quoted *ante*) explicitly required that such evidence be considered only if it involved violence or the threat of violence. Therefore, the trial court's failure to list the other crimes relating to factor (b) could not have affected the verdict.

■ Defendant finally contends the court was required to instruct sua sponte on the elements of robbery. We rejected this identical contention in *People* v. *Davenport, supra*, 41 Cal.3d at page 281, explaining that for tactical reasons a defendant may not want the penalty phase instructions to be overloaded with lengthy instructions defining other crimes. Thus, although a defendant is entitled to request instructions on the elements of other offenses, the court has no sua sponte duty to so instruct. (*People* v. *Melton* (1988) 44 Cal.3d 713, 754-755 [244 Cal.Rptr. 867, 750 P.2d 741].) Here, defendant did not request any instruction on the elements of robbery. The trial court did not err in failing to give such an instruction on its own motion.

### I. Guilt phase jury's consideration of other-crimes evidence at the penalty phase.

Defendant contends he was deprived of his constitutional right to due process of law by having the same jury that rendered the verdict at the guilt phase charged at the penalty phase with determining beyond a reasonable doubt whether he committed other, unadjudicated criminal activity. We repeatedly have rejected this same argument (*People* v. *Howard, supra,* 44 Cal.3d at p. 425; *People* v. *Miranda, supra,* 44 Cal.3d at p. 97; *People* v. *Balderas, supra,* 41 Cal.3d 144, 204-206), and defendant presents no persuasive basis for us to reconsider these holdings.

### J. Defendant's age.

Defendant contends the court improperly instructed and the prosecutor improperly argued that defendant's age could be considered as an aggravating factor in the determination of penalty.

The prosecutor argued there were no conceivable mitigating circumstances surrounding the crime, and that defendant was "not a kid anymore. You know, he's 23 years old. . . . You're not dealing with some 17 or 18 year old, you're dealing with a mature adult." Defendant's counsel did not object, subsequently arguing that defendant's age was a mitigating factor: "Stephan's still young. He was 22 when he committed this crime, not a teenager, but still a young man." The court instructed the jury in accordance with current CALJIC No. 8.85, which lists the age of a defendant as a relevant factor in determining the penalty.

Defendant's claim has no merit. Age can be argued as either a mitigating or aggravating factor, depending upon the circumstances of the crime. (*People* v. *Edwards, supra,* 54 Cal.3d at p. 844; *People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052] [age functions "as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty"].) The prosecution and the defense each may have its own theory for assessing the factor of age in its favor. (*People* v. *Cox* (1991) 53 Cal.3d 618, 675 [280 Cal.Rptr. 692, 809 P.2d 351].) That was true here. The prosecutor, in arguing defendant was fully responsible for his acts, relied on the circumstance that he was no longer a youth, and the defense relied on his still being a young man who as a juvenile had exhibited commendable qualities. We find no error or misconduct.

### K. Alleged prosecutorial misconduct.

Defendant contends the prosecutor engaged in misconduct when, during closing argument, he commented that "you can be sure that if the punishment of life without parole is imposed upon this Defendant, that every

waking moment from now on he will be figuring ways or a way, if possible, of getting out of custody. Whether he ever does or not, who knows, but you can be sure that he will be hoping to be released and, if possible, he will secure that release. [¶] If the defense argues to you death is not a deterrent, I've never heard of a case where a person executed for crimes came back and committed crime again." Later he argued, "And as long as he is alive in the prison, regardless of what the prison facility is, he will be trying and hopefully, as far as he is concerned, be accomplishing just that. If he is executed, there is no such possibility."

Defendant contends the foregoing comments improperly invited the jury to speculate upon matters and future events extraneous and irrelevant to the determination of penalty. Defendant's claim, however, is deemed waived by his failure to object at trial. A timely objection and admonition would have cured any possible harm. (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 650 [244 Cal.Rptr. 181, 749 P.2d 836].)

Moreover, there is no reasonable possibility that absent the remarks, the outcome would have been more favorable to defendant. It is true that counsel's argument at the penalty phase must not give jurors the impression that the selection of penalty is not a decision for the jury alone. (*People* v. *White* (1968) 69 Cal.2d 751, 762 [72 Cal.Rptr. 873, 446 P.2d 993].) Accordingly, a jury should not be invited to speculate upon future unpredictable events, such as the defendant's possible future release, or the threat of escape. (See *id.*, at p. 762; *People* v. *Morse* (1964) 60 Cal.2d 631, 643 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) For the same reason, consideration of the possibility of pardon, parole, or commutation is improper. (*People* v. *Ramos* (1984) 37 Cal.3d 136, 155-157 [207 Cal.Rptr. 800, 689 P.2d 430].)

The prosecutor's comments in the present case referred to matters extraneous to the penalty determination. They were too indefinite, however, to have prejudiced defendant. He did not refer to the actual possibility of release by such means as escape or commutation, but averred only as a matter of common sense to the reality that an imprisoned criminal will probably always be seeking release. The prosecutor's remarks here are similar to, but less direct than, those in *People* v. *Hovey, supra*, 44 Cal.3d 543, 581 (" 'Laws can change, people can escape and the crime is too awful . . .' "). There we found no prejudicial error in such remarks, characterizing them as matters of common knowledge likely to be appreciated by every juror making the penalty determination. We conclude no prejudicial misconduct occurred in the present case.

### L. *Failure to reinstruct the jury on general principles.*

During its penalty phase deliberations, the jury sent the court a note requesting: "All the judges [*sic*] instructions on second phase, read back to us slowly." (Underscoring in original.) The court reread the majority of the penalty phase instructions previously given. It did not repeat certain standard closing instructions on general principles which essentially reiterated the closing instructions given at the guilt phase.[10] After the jury retired to continue its deliberations, defendant's counsel objected to the court's not having repeated the closing instructions. The court inquired whether counsel wished to have the jury brought back to have the instructions reread. Defense counsel replied the decision was a matter for the court. The jury was not called back.

■■■ Defendant now claims the failure to reread the instructions in question violated section 1138, which provides that if the jury "desire to be informed on any point of law arising in the case, . . . the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." He argues these instructions were crucial at the penalty phase from his standpoint, because they required each juror to make an individual determination based upon his or her own moral judgment, without the pressure of majority sentiment.

The court's handling of the jury's request for reinstruction was not inappropriate. The court had given the standard instructions required at the guilt phase and the penalty phase. In response to the jury's request for the "instructions on second phase," the court reread all instructions which pertained specifically and were peculiar to the penalty phase. The court thereby complied with the jury's request for rereading of penalty phase

---

[10]The closing instructions which the court did not repeat were the following: "Now, ladies and gentlemen, again, both the People and the defendant are entitled to the individual opinion of each juror. [¶] And, likewise, it is your duty to consider the evidence for the purpose of arriving at a verdict. Each of you must decide the case for yourself, but should do so only after a discussion of the evidence and instructions with the other jurors. [¶] You should not hesitate to change an opinion if you are convinced it's erroneous. However, you should not be influenced to decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision. [¶] The attitude and conduct, again, ladies and gentlemen, of jurors at the beginning of their deliberations are a matter of considerable importance. It is rarely productive of good to immediately make an emphatic expression of an opinion on the case or how you intend to vote. When a person does that at the outset, his sense of pride may be aroused, and he may hesitate to change his position even if shown it is wrong. Remember, you are not partisans and you are not advocates. You are judges." The instructions correspond to the standard CALJIC Nos. 17.40 and 17.41. These same standard instructions were given at the guilt phase, although with a few variations.

instructions. Because the closing instructions on general principles given at the guilt phase were repeated at the penalty phase, their recitation a third time was not necessary in order to ensure the jurors' proper discharge of their duties. (See *People* v. *Melton, supra*, 44 Cal.3d 713, 758 [no prejudicial error where the trial court failed to repeat sua sponte at the penalty phase all the instructions it had given at the guilt phase concerning general principles applicable to jury deliberations].)

M. *Denial of motion to modify judgment.*

Defendant contends the court erred in denying the automatic motion to modify the verdict under section 190.4, subdivision (e). Under that section, the court must independently reweigh the evidence of aggravating and mitigating circumstances and then determine whether, in the court's independent judgment, the weight of the evidence supports the jury's verdict. It must set forth its reasons with sufficient particularity to allow effective appellate review. (*People* v. *Edwards, supra*, 54 Cal.3d 787, 846; *People* v. *Kelly, supra*, 51 Cal.3d at p. 970.)

The record reflects the trial court fully complied with its responsibilities in the present case. The court expressly reviewed the prosecution's evidence in aggravation and rebuttal. The court also considered at length the evidence in mitigation, concluding this evidence did not extenuate the gravity of the circumstances of the crime. The court then reviewed seriatim the specific factors listed in section 190.3, commenting as to whether each was applicable to the present case. The court's thorough analysis of the evidence reflects its independent determination that the verdict of death should not be modified.

Defendant's specific claims of prejudicial error as to the court's review of the law and the evidence have no merit. He first contends the court's consideration of his juvenile assaults on the bus driver and the construction worker as aggravating factors was improper. As discussed in part F, *ante*, however, evidence of the juvenile assaults constituted proper rebuttal, and the court was entitled to consider it as such in reviewing the evidence in mitigation. The court was further entitled to consider such evidence in aggravation to the extent it was relevant to factor (b) of section 190.3.

Defendant next contends the court improperly considered the Lucky store and Vogue Fashion robberies and Williams's post crime-trauma testimony. We reject defendant's claim of error for the same reasons that lead us to conclude evidence of these events was properly introduced in aggravation, as other-crimes evidence under factor (b) of section 190.3, either as part of the

prosecution's case-in-chief at the penalty phase, or, in the case of the Vogue Fashion robbery, as proper rebuttal.

We have determined the court did not err in performing its duties under section 190.4, subdivision (e).

### N. *Effective assistance of counsel.*

Defendant contends he received ineffective assistance of counsel at the penalty phase. We apply the same standard in reviewing this claim as in our evaluation of defendant's claim of ineffective assistance at the guilt phase. (See *Haskett II, supra,* 52 Cal.3d at p. 248.)

 Defendant first contends his counsel was incompetent for stipulating to the excusal of two prospective jurors. The decision to stipulate to the excusal of a juror, however, is a tactical one not subject to second-guessing by this court. (See *Haskett II, supra,* 52 Cal.3d at p. 250.) Moreover, the record of the voir dire indicates the two jurors would likely have been excused for cause because of their adverse views concerning the death penalty. For this reason, and because the record fails to reflect an unsatisfactory reason for counsel's decision to stipulate to excusal of the two jurors, defendant's claim of ineffective assistance of counsel on this ground must fail. (*Ibid.*)

Defendant also contends his counsel was ineffective in failing to object to the cross-examination of defense witnesses and to the introduction of evidence on rebuttal pertaining to his juvenile conduct. As discussed, *ante,* however, the rebuttal evidence was properly admitted, and counsel's failure to object might well have been based upon the reasonable assumption that an objection would be overruled. Counsel's failure to make a meritless objection does not constitute deficient performance.

 Defendant next contends his counsel was ineffective in stipulating to the admission of the juvenile court file. The record, however, reveals a plausible strategic reason for doing so. Defense counsel, in his argument to the jury, relied extensively on the contents of the file as mitigating evidence. Defendant contends his counsel was inadequately prepared to make the decision whether to stipulate to the admission of the juvenile court file because counsel "apparently" had not reviewed the file prior to its admission. Defendant refers to his counsel's comment, after the prosecutor requested the court take judicial notice of the file, that "We have not seen that," followed by counsel's request for a recess "in order for us to review that." The recess was granted, after which the defense stipulated to the admission of the file.

We disagree that counsel's comments and request for a recess show deficient performance. Counsel possibly was uncertain which file the prosecutor had in his hand or whether it contained documents other than those properly part of the juvenile court file. Competent counsel reasonably may feel compelled to review whatever the prosecution offers into evidence before deciding whether to stipulate to its admission.

In a related argument, defendant complains his counsel failed to object to the prosecution's having "surprised" the defense with the juvenile court file in violation of the pretrial discovery order to produce defendant's criminal record. Again, because the failure to object could have been based upon a plausible trial strategy, and because ultimately the evidence in question was properly admitted, defendant has failed to demonstrate deficient performance on the part of trial counsel.

Defendant next contends his counsel was deficient in failing to object to the prosecutor's argument that the contents of the juvenile court file could be considered as evidence in aggravation. He argues that reasonably competent defense counsel would have argued to the jury that the juvenile incidents, as well as the Vogue Fashion robbery, could not be considered as evidence in aggravation. As we explained *ante*, however, to the extent the juvenile incidents and the Vogue Fashion robbery related to a factor under section 190.3, such as factor (b), such evidence—although admitted in rebuttal—could also properly be considered by the jury as evidence in aggravation. Since the prosecutor during closing argument properly could refer to such evidence as rebutting the defense's mitigating evidence, competent defense counsel could have determined as a tactical matter not to draw further attention to the rebuttal evidence by making such an objection.

■ Defendant finally complains of his counsel's failure to object to claimed prosecutorial misconduct in closing argument. The prosecutor referred to the testimony of Dr. Lerner that defendant could have been under the influence of PCP, but that there was no actual evidence he was under the influence of PCP. The prosecutor argued: "I talked to you earlier about dazzling, you know, dazzle you with BS. Well, they can baffle you with BS; and that's what they're trying to do. They're trying to baffle you with the red herring, PCP."

Defendant contends this comment constituted *Bain* error (*People* v. *Bain* (1971) 5 Cal.3d 839, 847 [97 Cal.Rptr. 684, 489 P.2d 564]) in that it implied that defense counsel had fabricated a defense. We disagree. The remark was a fair comment on the evidence. Moreover, *Bain* states that the prosecutor should not imply that defense counsel fabricated a defense *where there is no*

*evidence to support that claim.* (See *People* v. *Loustaunau* (1986) 181 Cal.App.3d 163, 176 [226 Cal.Rptr. 216].) Here, however, the lack of any evidence that defendant had been using PCP at the time of the commission of the charged offenses warranted the prosecutor's comment on the testimony regarding use of PCP.

The record does not support defendant's claim of ineffective assistance of counsel.

O. *Cumulative impact of errors.*

Defendant's final contention is that the cumulative impact of errors at the penalty phase requires reversal of the death sentence. From our review of the record, we are persuaded that defendant received a fair and untainted trial on the matter of penalty. The Constitution requires no more. (*People* v. *Kelly, supra,* 51 Cal.3d at p. 970.)

CONCLUSION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., and Baxter, J., concurred.

**MOSK, J.**—I concur in the judgment, and generally in the opinion of the court.

I write separately to state my views on one matter. When, as here, we review a judgment of death on appeal, we should resolve the contentions in such a way as to arrive at a proper disposition of the cause. And we should do no more.

Certainly, we should never address points in an appeal merely in an attempt to "forestall" a subsequent petition for writ of habeas corpus. The Great Writ has always held a lofty place in Anglo-American jurisprudence and it should never be demeaned by the application of artificial constraints.

By now, we know we cannot preclude a habeas corpus petition. Whenever we affirm a judgment of death, we are before long visited with a request for extraordinary relief. By now, we also know we cannot block any given claim in such a petition. Whatever we reject on appeal, we may eventually reconsider on habeas corpus, albeit almost always in an at least slightly different form. Today, we should decide what must be decided. The rest we should leave to tomorrow.

Appellant's petition for a rehearing was denied April 23, 1992.