Filed 10/7/16  P. v. Bell CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E063330 |
| v. | (Super.Ct.No. FVI1302127) |
| GARY BELL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Debra Harris, Judge.  Affirmed.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Collette Cavalier and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

In March 2015, a jury convicted defendant Gary Bell of first degree murder (Pen. Code, § 187, subd. (a)) in connection with a shooting that occurred in May 2000. The trial court imposed a sentence of 25 years to life.

On appeal, defendant asserts the following claims of error: (1) the trial court erroneously instructed the jury on aiding and abetting, in the absence of sufficient evidence to support such an instruction; (2) defendant was deprived of effective assistance of counsel by his trial counsel's failure to move to exclude certain statements by law enforcement officers in videotaped interviews with defendant that were played to the jury; and (3) the trial court should have excluded certain evidence introduced by the prosecution to impeach a defense witness. He contends that these errors, individually and cumulatively, require reversal of his conviction.

We find no error, and affirm.

## I BACKGROUND

On May 8, 2000, the body of Louis Frake aka Louis Horner (victim) was discovered alongside a freeway off ramp near Barstow, California. He had been shot five times. Several Winchester .380 cartridges were found nearby. The victim's pants were unzipped and his penis was exposed; a moist area on the ground nearby was consistent with urine, and a later autopsy would find his bladder to be empty. A folded wad of $940 in cash was found in his pocket. His wallet contained, among other things, his New Jersey driver's license, as well as a business card with the name "Gary," a phone number, and a room number handwritten on it. Also in the wallet were torn pieces of paper with two phone numbers, one for "Gary" and one for "Vic."

2

On May 12, 2000, police found the victim's car in a grocery store parking lot in San Bernardino. A search of the car revealed, among other things, $12,900 in one hundred dollar bills under the back seat; a cigarette butt in the center console ashtray; and fingerprints on a seat belt buckle. In 2014, analysis would determine DNA found on the cigarette butt matched defendant's DNA profile, and the fingerprints on the seat belt buckle matched defendant's fingerprints.

The phone number for "Gary" found in the victim's wallet belonged to Debra Holly, who was then defendant's girlfriend, and with whom he stayed when he was in town. She lived a short walk from the location the victim's vehicle was found. She told police in 2000 that prior to the murder, a man named Louis had called her phone number twice, asking for "Gary."

A friend of the victim, David Phoebus, testified at trial that on May 5, 2000, he had met with the victim at a bar in New Jersey. Phoebus testified that the victim showed him an attaché case in the trunk of his car filled with "a sizable amount" of money, which the victim said he planned to double in California. When Phoebus was interviewed by law enforcement in 2000, however, Phoebus did not mention the attaché case.

In 2000, Victor Ross was defendant's long-haul truck driving partner and close friend. Ross's girlfriend at the time was Karla Richardson. Richardson testified at trial that the victim had been to her house several times. She described one occasion when defendant, Ross, a nephew of Ross named Ty Dawson, and the victim (whom defendant had referred to as "the white boy") were all at her house, and they had cocaine on her kitchen table. Richardson heard defendant tell the victim that he knew where he could

3

get a large quantity of cocaine for the victim to purchase, for about $250,000. Richardson told defendant that the victim "was stupid" because "he didn't know them." Defendant responded that "it was all cool . . . it was trust." Later, however, defendant told Richardson, "I'm gonna get this money from this white boy, stupid people do stupid things."

Richardson further testified that, after the victim's murder, Richardson was at Holly's apartment with Holly, Ross, Dawson, and defendant. She observed defendant with a bag of money; he gave Dawson $10,000, but Ross did not take any.

Richardson's trial testimony was not identical to her previous statements to police. She had previously told police that defendant had told her that he had shot the victim, but she testified that she did not in fact hear him say that. Also, in a recorded excerpt of an interview with a detective that was played for the jury, Richardson stated that defendant gave Dawson $20,000. She also elaborated in the recorded interview excerpt that the purported drug deal was a ruse to "lure" the victim; defendant did not have any drugs, but only intended to "set [the victim] up and take all the money . . . ."

In 2000, law enforcement was unsuccessful in making contact with defendant. Detectives eventually spoke to defendant in two interviews, both conducted in 2013, and both of which were recorded and played for the jury. During the first interview, defendant recognized a picture of the victim as someone he and Ross had met at a strip club in New Jersey; at the time, defendant had been working as a long-haul trucker making runs between California and New Jersey. Defendant stated that he had talked to the victim by phone, when the victim called him to ask him about "[b]uying some dope."

4

Defendant was concerned that the victim was trying to set him up, and told him "I don't know about no dope." Defendant knew from talking to Ross, however, that the victim came to California twice to purchase large amounts of drugs—specifically, marijuana and cocaine—to take back to New Jersey. Defendant repeatedly denied ever being in the victim's car, and denied that any of the cigarette butts found in the car could have been his.

In his second interview with law enforcement, defendant provided additional details regarding the two trips to California to purchase drugs that defendant mentioned in the first interview—and two different stories regarding the second trip. According to defendant, after he and Ross met the victim in a New Jersey strip club, they did drugs together, and Ross and the victim exchanged telephone numbers. Subsequently, the victim travelled to California on a trip organized by Ross, during which he purchased about 20 pounds of marijuana through Ross's nephew, Dawson.

Defendant also stated that before the victim's second trip to California, the victim called him from New Jersey, asking if he knew where he could get a large quantity of cocaine, as well as some methamphetamine and marijuana. The victim felt that he was being "ripped off" by Ross. But defendant told the victim that he did not know anybody. So the victim then contacted either Ross or Dawson, and returned to California to make "one large purchase" so that he would not "have to come back for a while."

Defendant further described how, when the victim arrived in California, defendant met him outside Holly's apartment; initially, just defendant and the victim, with Victor coming over an hour or so later. The three men went to a bar together, with the victim

5

driving them in his car, and defendant riding in the passenger seat. A few hours later, the victim dropped defendant off at Holly's apartment, while the victim and Ross drove to meet Dawson. Defendant left to visit his sick mother in Chattanooga the next morning. He never saw either Ross or the victim again. Ross called him a few days later, however, and told him that the victim had been killed (while denying involvement).

After additional questioning, defendant changed his account of the victim's second trip to California to purchase drugs. Defendant told police that the victim was shot by someone named Tony. Tony (whose last name defendant did not know) lived in the same apartment complex as Holly. Tony and defendant were hanging out when the victim came out to see Ross. After defendant, Tony, Ross, and the victim went to a bar together, Ross left, and the remaining three went for a drive, heading towards Las Vegas. Tony and the victim had been in an argument earlier about "money and drugs," but Tony said that he knew where to get drugs; the victim drove, defendant rode in the front passenger seat, and Tony gave directions from the back seat. At one point, they pulled off the road to relieve themselves. Defendant was standing near the front of the car, the victim and Tony at the back of the car, when defendant heard several gunshots. Defendant did not see the gun, but saw Tony pointing it, and saw flashes. Defendant was scared, and jumped back into the car. Tony got back into the car too, and they returned to San Bernardino, stopping along the way for cigarettes and a soda. Tony said that he shot the victim because he was "tired of the white boy." Upon arriving back in San Bernardino, defendant went home for a while, then left for Chattanooga to visit his mother, as he had previously planned.

6

At trial, defendant testified in his own defense, again attributing the victim's murder to Tony, and denying any prior knowledge or involvement.

The defense also called Holly, who testified that she never saw defendant with large sums of money or cocaine. She further stated that she never met anyone from New Jersey with defendant and Ross, and that there never was a meeting at her house where she was there with Richardson, Ross, and Dawson. She characterized Richardson's testimony about defendant being at Holly's house with a bag full of money, and giving it out to people, as a "lie."

Ross was also called by the defense. He testified that he and defendant had met the victim in New Jersey, and that the victim had come out to visit in California with someone named John. He denied, however, that there was ever an occasion when he was at Richardson's house with defendant and persons from New Jersey when there was cocaine on Richardson's dining room or kitchen table. He denied that defendant had ever been at Holly's house with defendant, Dawson, and Richardson, when defendant had a big bag of money and was passing it out, stating that it "did not happen." He also denied telling Richardson that defendant had shot anybody from New Jersey. He testified that the last time he saw defendant was before the victim was killed, and he had talked to defendant one time since then, in 2007.

On cross examination, the prosecutor asked Ross if he had ever told a detective that he had "seen [defendant] with a gun but . . . didn't know what kind it was." Ross testified that he did not recall. The prosecutor also asked whether Ross told a different detective he was "offered money because of [the victim's] murder" and that he had

7

responded that he "wanted nothing to do with it." Ross testified that he did not recall. The prosecution later introduced evidence to impeach Ross on those two issues. An excerpt of an interview with a detective was played for the jury, in which the detective asked Ross if he heard correctly that Dawson had called Ross, and "started talking about getting money from [defendant], and you said, 'I don't want nothing to do with that and you shouldn't have nothing to do with that, either.'" Ross responded: "Yeah." Also, another detective testified that Ross had told him that he had once seen defendant with a gun in his waistband. Ross was not able to precisely identify when this occurred, only estimating it "could possibly" have been within a year of the victim's murder.

## II. DISCUSSION

### A. The Trial Court Did Not Err By Instructing Jury on Aiding and Abetting.

The trial court, at the request of the prosecution, instructed the jury using several standard instructions regarding different aspects of liability for aiding and abetting a crime. Defendant contends these instructions were not supported by substantial evidence, and therefore were not properly given. We find no error.

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) "A party is entitled to a requested instruction if it is supported by substantial evidence"; conversely, "instructions *not* supported by substantial evidence should not be given." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049-1050 (*Ross*).) "Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.'" (*Ibid.*)

8

Here, there was substantial evidence in support of the instruction on aiding and abetting. The defense argued that Tony was the shooter, while defendant was "just along for the ride," and had no intent to aid or abet Tony's actions. The prosecution's primary theory of the case was that defendant shot the victim during the course of a robbery, and that "Tony" does not exist. The jury, however, reasonably could have accepted only part of each side's arguments. It could have believed defendant's own statements, placing him on the scene of a shooting actually committed by Tony. At the same time, it could also have believed the prosecution's evidence, tending to show defendant had an active role in planning at least the robbery, if not the murder, of the victim; for example, Richardson's statements that defendant told her before the murder that "I'm gonna get this money from this white boy, stupid people do stupid things," and that she had later seen him passing out large sums of money, as well as her statement to police (later retracted) that defendant had told her that he shot the victim. These facts constitute substantial evidence to support a murder conviction on an aiding and abetting theory.

In arguing for the contrary conclusion, defendant asserts that "the People made no attempt to establish anyone other than appellant shot [the victim]." This assertion is not supported by the record; the prosecution explicitly argued the aiding and abetting theory as an alternative also supported by the evidence, if the jury believed defendant's testimony that Tony was the shooter. Furthermore, whether or not the instruction was appropriate turns on whether or not it was supported by substantial evidence, not whether it was a point of emphasis by either the prosecution or the defense. (*Ross, supra*, 155 Cal.App.4th at 1049-1050.) For the reasons discussed above, there was evidence in

9

support of an aiding and abetting theory sufficient to deserve consideration by the jury, so instructions on aiding and abetting were properly given.

## B. Defendant Fails to Establish That Trial Counsel Was Ineffective.

Defendant argues his attorney provided ineffective assistance of counsel by not objecting to portions of defendant's videotaped interviews with police, specifically, by not requesting the court to redact certain statements made by the interrogating officers. We find no ineffective assistance of counsel.

To demonstrate ineffective assistance of counsel, a defendant must show: (1) "counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms"; and (2) prejudice resulted from the counsel's deficient performance, i.e., "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*People v. Williams* (1997) 16 Cal.4th 153, 214-215.) Generally, a reviewing court does not second-guess trial counsel's strategic and tactical choices. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 (*Mitcham*).) There is a "'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) "A defendant who raises [ineffective assistance of counsel] on appeal must establish deficient performance based upon the four corners of the record." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) The judgment must be affirmed "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged . . . unless counsel was asked for an explanation and failed to provide one, or

10

unless there simply could be no satisfactory explanation." (*People v. Pope* (1979) 23 Cal.3d 412, 426, overruled on other grounds by *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)

In this case, the rule that we generally will not second guess trial counsel's strategic and tactical choices resolves the issue.[1] The statements that defendant finds objectionable in this appeal are moments when the interrogating officers push back against defendant's story; for example, statements that defendant was lying about not being responsible for the victim's murder; that other witnesses had implicated him; that he had planned on setting up the victim for purposes of robbery; that no one named "Tony" was involved, and that in fact defendant had acted alone. Defense counsel spoke at some length during closing arguments about the "style that detectives use" in interviewing suspects, trying to elicit information. Counsel emphasized that defendant "remained firm" about his story, despite being pushed by his interrogators. In contrast, according to defense counsel, detectives did not push other witnesses, such as Phoebus, instead taking what they said "at face value." This line of argument was aimed, it seems, particularly at undermining the testimony of prosecution witnesses establishing motive (robbery), and supporting the veracity of defendant's own testimony about the circumstances of the murder.

---

[1] We therefore need not, and do not, address the parties' arguments about whether the statements would have been admissible over a timely objection by the defense, and about whether any prejudice arose from admission of the statements in the absence of an objection.

11

In short, defense counsel reasonably could have opted to have the jury see the videotapes in unedited form to cast the police in an unflattering light, and have the jury discount statements to police by prosecution witnesses, while supporting defendant's own testimony. Because reasonable trial tactics appear to underlie counsel's actions, defendant has not established that counsel's performance was deficient. (*Mitcham, supra*, 1 Cal.4th at p. 1059.)

## C. Impeachment Evidence Was Properly Admitted, and Any Error Was Harmless.

At trial, Ross testified that he did not recall telling a detective that he had seen defendant with a gun, and that he did not recall telling another detective that he had been offered money because of the victim's murder, and that he had declined the offer. The prosecution presented evidence to impeach Ross on these statements, offering an excerpt of an interview transcript, and the testimony of police detectives who interviewed Ross. Defendant contends that this evidence was not properly admitted. We find no error, but in any event, any error was harmless.

"Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219.) Nevertheless, "a trial witness's deliberately evasive forgetfulness is an implied denial of prior statements, which creates 'inconsistency in effect' and authorizes admission of the witness's prior statements under Evidence Code section 1235." (*People v. Perez* (2000) 82 Cal.App.4th 760, 764.) Even where evidence would be inadmissible to show that the defendant committed a criminal act, it may be admissible on the issue of the witness's credibility. (E.g., *People v. Abel*

12

(2012) 53 Cal.4th 891, 928 [noting that evidence a defendant possessed weapons that were not used to commit a crime is inadmissible to show the defendant committed a criminal act, but could be admitted on the issue of a witness's credibility].)

We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) "When the admissibility of evidence depends upon determinations of fact, the trial court's findings, and in particular its credibility determinations, are reviewed under the substantial evidence standard." (*People v. Price* (1991) 1 Cal.4th 324, 413.)

Here, substantial evidence supports the trial court's implicit determination that Ross's asserted lack of memory with respect to his statements to police constituted deliberate evasions. Ross admitted that he did not want to come to court to testify, and that he was upset when law enforcement contacted him, because he did not want to be involved in the case. Ross's description of why he was upset arguably suggests a conflation between not wanting to be involved and not having any knowledge: "I was [upset] because I didn't want to be—I don't know nothing about what's going on or nothing . . . ." Moreover, Ross did not profess a lack of memory only about what he had told law enforcement; he also responded "I'm not sure. I don't remember" when asked directly "Did you ever get offered money because of [the victim's] death and refuse it?" It is not beyond the bounds of reason to believe that being offered money in connection with someone's murder is not something that one forgets, absent extraordinary circumstances; it either happened or it did not happen.

13

In short, the trial court had a better opportunity to assess Ross's demeanor and the amount of credibility that should be given to his assertions of lack of memory than we do. Nevertheless, a reasonable basis to conclude Ross was being deliberately evasive appears even on the face of the cold record. As such, evidence of Ross's prior statements was properly admitted under Evidence Code section 1235 and the case law cited above.

In any case, even assuming that the trial court erred in some respect by admitting the challenged evidence, any error was harmless. Ross's statement that he had once seen defendant with a gun was essentially cumulative of defendant's own statement to police that he had shot handguns before. Ross's statement that he had been offered (and declined) money in connection with the victim's murder was cumulative of Richardson's more detailed and specific testimony, observing defendant with a bag of money after the murder, and handing large sums out to others, but not Ross. And neither statement by Ross substantially supports or undermines the central pillars of the prosecution's case against defendant, namely, defendant's own statements, including his trial testimony, placing himself on the scene of the murder, and establishing his knowledge that the victim had travelled to California with large sums of money to purchase drugs; Richardson's testimony that defendant planned to "get this money" from defendant; and the implausibility of defendant's self-serving story about "Tony." It is therefore not reasonably probable that the admission of the challenged evidence affected the verdict, even if we were to accept defendants' arguments that it was erroneously admitted. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

14

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


      HOLLENHORST
Acting P. J.

We concur:

      MILLER
J.

      CODRINGTON
J.

15