Filed 6/29/21  In re A.D. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.D., a Person Coming Under the Juvenile Court Law. | |
| MERCED COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.D., <br><br> Defendant and Appellant. | F081589 <br><br> (Merced Super. Ct. No. 20JP-00013-A) <br><br> **OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Merced County.  Donald J. Proietti, Judge.

Suzanne M. Nicholson, under appointment by the Court of Appeal, for Defendant and Appellant.

Forrest W. Hansen, County Counsel, and Jennifer Trimble, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant (Mother) is the adoptive mother of minor A.D., who is the subject of a dependency case. Mother challenges the dependency court's jurisdictional/dispositional orders on the grounds that she received ineffective assistance of counsel. We reject these contentions and affirm.

## FACTS

On February 5, 2020, the Merced County Human Services Agency (the "Agency") filed a dependency petition concerning A.D. pursuant to subdivisions (a) and (b)(1) of section 300. Two days prior, the Agency had received a referral alleging that A.D. had bruising on her left arm, back and shoulder. A.D. said Mother had hit her with a "chancla"[1] after taking 5 cookies without permission.

Mother claimed the injuries were sustained by A.D. " 'falling off her bike.' " However, the petition alleged that the injuries were not consistent with Mother's explanation. An emergency room physician said A.D. had "multiple bruises in different stages of healing (some were 'fresh' and some were a week old) …."

The petition further alleged that A.D. had been now been removed from Mother's care on four occasions. In August 2018, A.D. was removed because Mother was arrested and incarcerated.

In February 2018, A.D. was removed due to physical abuse. In that prior case, like the present case, Mother had claimed A.D. fell off a bicycle, but her injuries were inconsistent with that explanation.

In 2016, A.D. was removed from Mother "due to caretaker absence."

---

[1] "Chancla" is Spanish for "sandal."

2.

*Detention Report*

A detention report dated February 6, 2020, appears in the appellate record.[2]  It recounts that on February 3, 2020, a social worker and sheriff's deputy responded to A.D.'s elementary school.  A.D. was initially uncooperative.

A.D. told the social worker she " hate[s]' " Child Protective Services (CPS).  A.D. said her Mother had told her, " 'CPS takes children because they get paid to take kids.' " A.D. said she would not talk " 'because my mom will go to jail, she will eat bad food and her baby will get sick.' "

Eventually, A.D. showed the social worker "a six inch linear bruise on her left arm, several deep purple bruises on her lower back area, bruising in varying degrees of healing on both of her shoulders and bruising extending from her shoulder to her elbow on her right arm."  A.D. said she had eaten five cookies for breakfast, so her Mother to hit her with a sandal.  The social worker noted that "[s]everal of the bruises observed match bruising which appears to be caused by a sandal."  A.D said Mother "has not been using her 'breathing' to stop her from getting so angry which is why she hit her."

A.D. asked repeatedly for the social worker and sheriff's deputy not to talk to Mother about her injuries.  A.D. said, " '[Y]ou are going to take me into foster care, I know it.' "

The social worker and sheriff's deputy contacted Mother at her home.  Mother said A.D told her she fell off her bike on February 1.  Mother said she has not seen any bruising on A.D.  Mother said A.D. lies and that she recalled no incident involving A.D. eating cookies.  However, Mother later said that " 'she was supposed to eat breakfast, not cookies.' "

The detention report noted that in Mother's prior dependency case, she claimed A.D. had fallen off a bike yet the injuries were inconsistent with that explanation.

---

[2] The detention report in the record has no file stamp on its cover page.

Mother said she is the only person who cares for A.D. Mother denied using any physical discipline in the home. Mother's demeanor was flat and emotionless when speaking with the social worker and sheriff's deputy. When told her child was going to be removed, Mother did not show any emotion.

A social worker took A.D. to be seen by a doctor. The attending emergency room physician said A.D. "had multiple bruises in different stages of healing (some were 'fresh' and some were at least a week old) which demonstrates a pattern of non-accidentally harming [A.D.] .…"

At the detention hearing, the court ordered A.D. removed from Mother.

***Jurisdiction/Disposition Report***

On March 25, 2020, the Agency filed a jurisdiction/disposition report.

The report detailed Mother's history with child welfare. On June 2, 2016, the Agency received a referral pertaining to Mother and A.D. According to the referral, Mother had left for Mexico on May 3, 2016, and did not make arrangements for the care of A.D. A.D had initially been left in the care of different relatives, and the relative currently caring for A.D. was no longer willing and able to care for her. It turned out that Mother had been incarcerated in New Mexico.

On February 1, 2018, the Agency received another referral pertaining to Mother and A.D. A.D. told someone at her school that her Mother had hit her with a broom handle because she had a potty accident. A.D. had bruises. A.D. said this had happened in the past as well, and that her father knew about it. A.D. subsequently recanted, but the Agency determined the allegations of physical abuse were "substantiated" and removed A.D. from Mother's care.

On August 20, 2018, the Agency received another referral pertaining to Mother and A.D. Mother had become incarcerated and "did not make proper arrangements for the minor." Due to caretaker absence, A.D. was removed from Mother's care.

On October 1, 2018, the Agency received another referral pertaining to Mother and A.D. A.D. informed a mandated reporter that she fell into the deep end of the pool at her house while playing unsupervised. Though she did not know how to swim, she was able to "kick[] very hard" and get to a side. The Agency deemed the allegation of neglect to be "substantiated" and removed A.D.

On September 12, 2019, the Agency received another referral pertaining to Mother and A.D. According to the referral, A.D. arrived at school upset and crying. A.D. said her Mother had punched her in the stomach and face. The reporting party observed redness and slight bruising near A.D.'s eye. The reporting party went to A.D.'s home and spoke with "neighborhood children" in the area. The neighborhood children said they were aware of the physical abuse of A.D.

On September 24, 2019, the Agency received another phone call indicating that A.D. said her Mother slapped her for not understanding her homework. The Agency concluded the allegations were "inconclusive" because Mother's and A.D.'s statements did not ultimately support the allegations. Mother denied physically abusing A.D.

The jurisdictional/dispositional report also detailed further interviews conducted by the social worker. On February 18, 2020, the social worker interviewed A.D. A.D. said she herself was the problem because she does not listen to her Mother and makes her angry. When asked how she knows she makes Mother angry, A.D. replied, " 'My mom would get red in the face and start yelling at me and hit me.' " A.D. said she gives her Mother a lot of stress, which could cause her Mother to lose her pregnancy.

At one point during the interview, A.D.'s demeanor changed. She said "CPS" was keeping her in foster care to make money. Eventually A.D. said she did not want to talk anymore.

The social worker interviewed Mother on February 28, 2020. Mother described her relationship with A.D. as "loving" but "difficult." Mother said difficulties arose from A.D.'s attention-deficit hyperactive disorder (ADHD) and oppositional defiant disorder.

Mother said that A.D. had problems at school, including screaming at teachers, making verbal threats, destroying personal property and hitting peers. Mother also reported that A.D. did not want a baby sibling and would try to hurt younger kids in foster care.

Mother said she had no current criminal charges pending. She "reported she had a federal case in New Mexico in 2016 for transporting illegal aliens, and violated her probation in 2018 for [*sic*] unlawful possession of a controlled substance."

In response to the allegations in the petition, Mother said that A.D. had taken cookies but denied physically abusing her as a consequence. Mother said A.D. told her on February 1, 2020, that she had fallen off a bike and that her arm hurt. Mother did not check her for bruising because A.D. "lies a lot" and was not crying. Mother said A.D. inflicts injuries on herself.

The report also detailed that Mother e-mailed A.D.'s teacher on September 13, 2019, and denied physically abusing A.D. Mother claimed that A.D. admitted she made the allegations to get a break from classwork. Mother also claimed A.D. admitted the small bruise by her eye occurred when she bumped into another student.

A.D.'s caregiver reported that A.D. would steal treats from school and at home. They also reported A.D. would lie, steal, and not follow rules or authority. A.D. had also been acting defiantly at school. In the 2018 school year, A.D. had received several discipline referrals for disruptive behavior, defiance, inappropriate language, and hitting/pushing other students.

Medical records from the emergency room were attached to the report. The records indicate that A.D. reported she had been hit with "a broom" by Mother. A.D. denied physical abuse occurring in the past. However, bruises on her back and arms were "of different ages."

The report summarized the sheriff's deputy's narrative, which indicated A.D. had "severe" bruising on her right arm from her shoulder to her elbow.

Finally, the report explained that Mother visited A.D. regularly, but showed "minimal affection" during visits.

### *Jurisdiction/Disposition Hearing*

At the jurisdiction/disposition hearing, the Department requested that the court take judicial notice of A.D.'s prior dependency cases.[3]

### **Select Portions of Record from Prior Dependency Case**

A report filed in the previous case recounted that in 2017, A.D. had admitted to lying about being hit with a belt. Also, in 2017, A.D. claimed she had sex at school, but a medical examination "determined" her statement was false.

Another report filed in the previous case stated that A.D. appeared comfortable in Mother's presence. The report also indicated that A.D.'s behavior at home had become less disruptive because Mother engaged with A.D., utilized coping skills, and had activities for A.D. to engage in. A report from A.D.'s Court Appointed Special Advocate (CASA) stated A.D.'s behavior improves when placed with Mother and that A.D. "always expresses her love and care" for Mother.

### **Mother's Testimony**

Mother testified that she first learned of A.D.'s bruises when a social worker came to her house. Later, she "found out" how A.D. had obtained the bruises.[4]

Mother testified that A.D. had gotten bruises in the past from "playing around." However, "during the time when [Mother] supposedly hit her," Mother did not observe any bruises.

---

[3] The court responded to the verbal request for judicial notice by saying, "All right." Mother proceeds under the assumption the court granted the request, and we will do the same.

[4] Mother testified that A.D. told her that on the day before her removal, she had fallen off a bicycle. However, the court sustained hearsay objections to this testimony.

Mother testified she is always working to improve as a parent and utilizes resources – including classes – to do so.

According to Mother, A.D. "lies a lot" when she is in foster care.

Mother's counsel sought to introduce a social behavioral report about A.D. from 2018.[5] However, the trial court sustained objections to the report on hearsay and foundation grounds. The court also stated it was "concerned" that it is a "confidential privileged document and the presenter of the document, the holder of the document is not the holder of the privilege."

Mother testified that A.D. was removed from her care in February 2018 due to allegations of physical abuse. Mother told social workers at the time that A.D. had fallen off her bike.

On a telephone call, A.D. said she felt like she w 'as not going to come home. Mother admitted that she told A.D. in response: "[T]his is why…people shouldn't lie.' "

Mother also testified that she was affectionate with A.D. at visits.

Mother insisted she had not physically disciplined A.D.

### A.D.'s Testimony

Mother was not present for A.D.'s testimony.

A.D. testified that the bruises on her back in February were caused by Mother's "chancla shoe." A.D. testified she had eaten five cookies against her Mother's wishes, so Mother got angry, grabbed "the hard chancla" and hit A.D. five times. Nonetheless, A.D. testified she wanted to live with Mother.

A.D. denied every lying to her teachers or social workers.

### A.M.'s Testimony

Mother's niece, A.M., testified that she was caring for A.D. the day before she was removed. A.D. was riding her bicycle and kept falling. A.M. told A.D. to stop, but A.D.

---

[5] According to Mother, the report was prepared by A.D.'s school.

kept going on the bike and falling. On cross-examination, A.M. testified that A.D.'s bike had training wheels. However, A.M. said that training wheels were "messed up."

Later, A.D. began hitting herself with a scooter. A.D. said it did not hurt.

Even though A.D. was removed the next day, A.M. claimed she did not know of the removal for the next three months.

On cross-examination, A.M. testified that CPS removed her own siblings in February of that year.

A.M. said there have been many "issues with truthfulness with [A.D.]" One example she offered was that A.D. told her teacher that she fell in the pool while no one was watching but, in fact, A.M. was present watching her.

### Social Worker Zambrano's Testimony

Social worker Kristin Zambrano testified. Zambrano testified that while A.D. had been diagnosed with posttraumatic stress disorder and ADHD, she had not been diagnosed with oppositional defiant disorder.

Zambrano testified that while the September 2019 referral for physical abuse was deemed inconclusive, that only means there was not enough evidence to determine if it was false *or true*.

Zambrano testified that A.D. had been in two placements since the beginning of the dependency case. Her placement was changed "due to her behaviors in the home" including temper tantrums.

Zambrano again stated that Mother is not affectionate with A.D.

### Argument

Counsel was provided an opportunity to argue before the court after the close of testimony. Mother's counsel argued: "While I agree that [A.D.'s] testimony today was very credible, and I found her testimony to be very truthful, that is not to say that with the diagnoses and the past experiences of [A.D.] that she may very well believe that that is what happened."

9.

**Court's Ruling**

At the conclusion of testimony and argument, the court set forth its ruling and reasoning. The court began by agreeing with counsel that it was a "difficult situation when you have such extreme positions being taken in a case where mother is absolutely in denial and says that she has never, never physically disciplined or abused her child. And yet we have an eight year old who was described by mother as being anxious, had lost weight, with all types of personality disorders testified today with great confidence, great poise for a child who's almost nine years of age."

The court noted that Mother's counsel acknowledged A.D.'s credibility, "but suggested the Court should do some of its own analysis, go beyond the evidence and come up with an option that the child's testimony is not trustworthy because of her known diagnos[e]s …." The court said, "I will not do that. I cannot do that. I'm judging based on the evidence before me …."

The court noted the photographs of A.D.'s injuries were "pretty bad." The court expressed "shock[] at the lack of empathy that was expressed through the entire testimony of [Mother] where she could not be troubled to even check her daughter's body when she said her daughter was complaining of shoulder pain."

The court said it was relying "significantly" on the report of Dr. McClaren who examined A.D. in early February. The court specifically pointed to the report's objective findings that there were four areas of bruises of varying sizes and varying states of healing. The court noted Dr. McClaren described bruising that "likely occurred at different times and different places."

Ultimately, the court stated that it was "convinced that there has been injury to this child that occurred at the hands of [Mother] despite her vehement denials that she never laid a finger on her daughter." The court found A.D. was a person described by subdivisions (a) and (b) of Section 300 and declared her a dependent of the court. The

court denied reunification services to Mother under Welfare and Institutions Code section 361.5, subdivision (b)(3).[6]

## DISCUSSION

Mother contends her counsel was ineffective.

*Law*

All represented parties in a dependency case are entitled to "competent" counsel. (§ 317.5, subd. (a).) To prevail on a claim that counsel was prejudicially incompetent, a parent must show (1) that counsel failed to act in a manner to be expected of reasonably competent attorneys practicing in the field of juvenile dependency law and (2) that the claimed error was prejudicial. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1667–1668.)

To satisfy the first prong, it must be shown that "counsel's omissions were not the result of a reasonable tactical decision. [Citation.]" (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 255.) For example, whether to call certain witnesses at trial is a matter of tactics, which reviewing courts rarely second-guess. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059; see also *People v. Bolin* (1998) 18 Cal.4th 297, 334; *In re Kerry O.* (1989) 210 Cal.App.3d 326, 333.) Similarly, with regards "to whether certain witnesses should have been more rigorously cross-examined, such matters are normally left to counsel's discretion and rarely implicate inadequacy of representation. [Citations.]" (*People v. Bolin*, at p. 334.)

If there is a conceivable, reasonable explanation for counsel's conduct, the claim of ineffective assistance fails on appeal. (E.g., *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1716.) Put differently, if counsel's alleged deficiencies "are not apparent on the record, review by direct appeal is inadequate." (*In re Carrie M.* (2001) 90 Cal.App.4th

---

[6] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

530, 535.)  In such circumstances, the party claiming ineffective assistance of counsel must proceed by way of a petition for writ of habeas corpus.  (Cf. *id.* at pp. 533–535.)  Only when there could be no *conceivable* purpose for counsel's act or omission may an appellant obtain relief.  (*People v. Lewis* (2001) 25 Cal.4th 610, 674–675.)

*Analysis*

We will now address each of the ways in which Mother alleges counsel was ineffective.

Mother argues her counsel failed to challenge A.D.'s credibility through noninterested witnesses, including: the social workers who prepared the reports from the 2018 dependency case; the emergency room physician; foster parents; or A.D.'s teacher.  However, it is entirely conceivable that these were tactical decisions by counsel.  Counsel could have reasonably concluded that while these witnesses might have offered some helpful testimony, they also could have provided testimony harmful to Mother's case.  Counsel could have determined that any incremental benefit that would accrue from undermining A.D.'s credibility was not worth the risk that these witnesses would have *also* offered persuasive, credible testimony about topics such as the extent of A.D.'s injuries, A.D.'s statements about Mother, and/or examples of A.D. telling the truth.  On the present record, we simply cannot conclude counsel acted deficiently in this regard.

Mother also complains that counsel did not question social worker Zambrano about portions of the reports from the 2018 dependency case.  However, there are conceivable explanations for this "omission."  Perhaps counsel knew that Zambrano did not prepare the reports from the 2018 case and would lack foundation to testify about them.  Or perhaps counsel knew or had reason to believe Zambrano had additional information about the events described in the 2018 reports, which would have undermined their effectiveness in impeaching A.D.'s credibility.  Again, because there are *conceivable* explanations for counsel's behavior, Mother cannot prevail on direct appeal.

12.

Similarly, Mother contends counsel was ineffective for failing to question Zambrano about a report from the foster parent that A.D. has problems with lying. But that statement from the foster parents was included in the report; it speaks for itself. Moreover, there is no reason to believe that Zambrano would have anything useful to say about someone else's experience with A.D.'s lying.

Mother also contends it was improper for counsel to acknowledge that A.D. testified credibly. Again, this can be explained as a reasonable tactical decision. Counsel suggested that while A.D.' testified credibly, the testimony could still have been inaccurate due to her diagnosed conditions. Counsel could have made a tactical decision that, given A.D.'s apparently credible testimony, the best line of "attack" was not an accusation of lying but instead a suggestion that A.D. misstated facts without intent to deceive. Such an argument would be a reasonable exercise of tactical discretion by counsel.

Mother contends that counsel inadequately contested the issue of whether she should be bypassed for reunification services. Specifically, Mother complains that counsel did not cross-examine social worker Zambrano about statements favorable to Mother contained in a prior report. However, the extent to which a witness should be cross-examined "are normally left to counsel's discretion and rarely implicate inadequacy of representation. [Citations.]" (*People v. Bolin*, *supra*, 18 Cal.4th at p. 334.) In any event, the court was aware of the statements, having granted judicial notice of the prior dependency files. On the present record, there is no reason to believe Zambrano's testimony regarding the statements would have yielded anything helpful to Mother's case.

Mother also argues that counsel was ineffective for failing to call the social worker who prepared reports in the prior dependency case, the child's CASA, or employees from Mother's service provider, Aspiranet. However, whether to call certain witnesses at trial is a matter of tactics, which reviewing courts rarely second-guess. (See *People v.*

13.

*Mitcham*, *supra*, 1 Cal.4th at p. 1059; see also *People v. Bolin*, *supra*, 18 Cal.4th at p. 334.) In any event, this contention cannot be sustained on direct appeal. Again, it remains entirely conceivable that counsel knew, or reasonably believed, that the testimony of such witnesses, *on balance*, would not have been helpful to Mother's case. That is, counsel could have had information suggesting that some of the anticipated would have been harmful to Mother's case (even if other parts would have been helpful). Mother cannot prevail on the present record.

Finally, Mother notes that counsel did not refer to the prior reports of the Agency or CASA in argument to the dependency court. Again, this is a tactical matter left to counsel. Counsel could have made a reasonable tactical decision to focus her argument solely on what she considered her strongest points. Counsel could have concluded that by excluding arguments she considered "weaker," she could bolster her credibility before the judge and improve the chances her stronger arguments would prevail. Because there are conceivable, reasonable explanations for counsel's action, Mother cannot prevail on direct appeal.

## DISPOSITION

The orders are affirmed.

POOCHIGIAN, J.

WE CONCUR:

LEVY, Acting P.J.

SNAUFFER, J.

14.